**SOUTHERN PACIFIC TRANSPORTA-
TION COMPANY, a corporation,
Plaintiff,**

v.

**MATSON NAVIGATION COMPANY, a
corporation, et al., Defendants.**

**No. C-70-2111-CBR.**

United States District Court,
N. D. California.

Oct. 25, 1974.

Frederick E. Fuhrman, San Francisco, Cal., for plaintiff.

Peter P. Wilson, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

Southern Pacific Transportation Company ("Southern Pacific") brought this action against Matson Navigation Company ("Matson") to recover $5,024 [1] in demurrage charges incurred on 72 prepaid shipments originating from various points within the United States and delivered to Matson or its agent at Oakland, California, for shipment to Hawaii. The facts, as stipulated by the parties, are as follows.

Southern Pacific is a common carrier of property by railroad engaged in interstate commerce. Matson operates both as a terminal operator and as a common carrier by water, holding itself out to unload cargo in its former capacity and to load and transport it to Hawaii in its latter capacity. Each of the shipments involved in this litigation was covered by two bills of lading, one issued by the origin rail carrier covering the movement to Oakland, and a second, ocean bill of lading, covering the movement to Hawaii. In all instances, the inland shipper appeared as consignor on both bills of lading, and in most cases the Hawaii purchaser appeared as consignee. On these bills of lading Matson was named as the "care of" party. However, in a few cases the shipment was consigned to defendant on the railroad bill of lading.

The demurrage charges arose because each of the shipments was either not booked with Matson prior to its arrival in Oakland or, although booked, arrived in advance of the Matson vessel's scheduled receiving period.[2] Although Southern Pacific gave Matson timely notice of the arrival of the rail carriers and its readiness to deliver them to Matson's agent for unloading, the latter was unable to receive them immediately, and the cars remained at plaintiff's Oakland yard. The demurrage began to accrue following the expiration of the five-day free time period permitted by Southern Pacific's applicable tariff.

Both parties have moved for summary judgment. The material facts not being in issue, a decision on the merits is appropriate. For the reasons set forth below, the Court holds that a connecting carrier which appears neither as shipper nor consignee in a bill of lading cannot be held liable by the railroad carrier for demurrage where the shipment either was not booked on the connecting carrier or arrived before the scheduled receiving period.

Both parties have submitted extensive briefs on the issues raised and have responded in writing to questions posed by the Court. Southern Pacific stresses that it was an involuntary participant in the events which gave rise to the demurrage and that somehow this fact entitles it to recover against Matson. It is true, as Southern Pacific argues, that as a common carrier the railroad is obligated to accept and transport all cargo tendered to it, even if it knows that the cargo has not been booked on a connecting carrier or has been shipped too early. However, that fact does not dis-

1. In its complaint Southern Pacific sought to collect $4,035 in accrued demurrage charges, but Exhibit A attached to a Stipulation and Order signed by the Court on October 7, 1974, reveals this figure to be $5,024. The Court will leave to the parties the appropriate amount to be established by the judgment to be prepared by counsel for Matson in this case.

2. It was the usual procedure for the shipper to arrange both for the rail phase and the ocean phase of the trip. Matson did not have any role in scheduling the dates for the rail transportation.

pose of this case. Neither party disputes that demurrage charges accrued in the amount sought. The question before the court consequently is not whether plaintiff is entitled to collect those charges from someone, but whether it is entitled to collect those charges from Matson.[3]

■ The obligation to pay demurrage arises either out of contract, statute or prevailing custom. Middle Atlantic Conference v. United States, 353 F.Supp. 1109, 1118 (D.D.C. 1972). Neither party has directed the Court to a controlling statute or prevailing custom, thus the Court must look to the contracts involved.

■■ The promise to pay demurrage need not be an express one, but may be implied in order to compensate the carrier for the use of its equipment. *Middle Atlantic, supra,* at 1114 n. 13; Ben Franklin Transp. Co. v. Federal Sugar Refining Co., 242 F. 43, 46 (2d Cir. 1917). But, while the obligation to pay may be implied, the promise nonetheless arises out of the contractual relationship and may only be imputed to parties to the contract.[4] *Middle Atlantic Conference, supra,* 353 F.Supp. at 1118–1119. New York Board of Trade v. Director General, 59 I.C.C. 205, 209 (1920). Detention of Motor Vehicles—Middle Atl. & New England, 318 I.C.C. 593, 607 (1962). *See* Southern Railway System v. Leyden Shipping Corp., 290 F.Supp. 742, 745 (S.D.N.Y. 1968).

In *Middle Atlantic Conference,* various motor common carriers filed a proposed tariff specifying that "certain warehousemen, pier operators, brokers, steamship agencies, and others similarly situated" were to be liable under certain circumstances for detention charges.

Liability was imposed by defining these parties as consignees, regardless of whether they were in fact so named in any given bill of lading. The Interstate Commerce Commission prohibited the motor carriers from defining "consignee" in that manner, and the carriers filed suit to challenge the Commission's action. A special three-judge court unanimously upheld the I.C.C.'s position, finding that the proposed tariff would have imposed liability where none otherwise existed. The court noted at the outset of its opinion:

"Th[e] formulation of the issue by plaintiffs is a clear admission that the carriers are attempting through the tariff to *impose* liability upon parties who are not named in the bills of lading as consignors or consignees. In the absence of this tariff provision the warehousemen would not be liable for detention charges under such circumstances and thus what is attempted is in effect a 'legislative' change in the current law determining their liability." *Middle Atlantic, supra,* 353 F.Supp. at 1113 (emphasis in original).

After analyzing the relevant cases and authorities, the court concluded:

"Since persons liable for demurrage charges are to be determined by the ordinary rules of the common law [citation deleted], the parties to a contract of carriage are perfectly free among themselves to contract with respect to the payment of demurrage * * * but where they have not become contractually obligated to pay demurrage because common law principles exonerate them from liability, and they are not made liable by statute or custom, liability cannot then

---

3. As to the issue of liability between the shipper and consignee who had no role in or control over either the loading or unloading of the railcars, see Western Pac. R. Co. v. Pacific Portland Cement Co., 84 F.Supp. 15, 16 (N.D.Cal. 1949).

4. This conclusion receives additional support from the rule found in a number of cases that

demurrage is "extended freight." Pennsylvania Railroad Co. v. Moore-McCormack Lines, Inc., 370 F.2d 430, 432 (2d Cir. 1966). Southern Railway System v. Leyden Shipping Corp., 290 F.Supp. 742, 744 (S.D.N.Y. 1968). As such, demurrage, like freight, arises from contract and is payable, in the absence of special agreement, by parties to the contract.

be imposed upon them legislatively through the device of a tariff." *Middle Atlantic, supra,* 353 F.Supp. at 1120. (footnote omitted)

Since the warehouseman occupied a position analogous to Matson's in the instant case, the Court finds *Middle Atlantic* controlling.

The Court sees no reason to decide whether Matson acted as an "agent" or an "independent contractor" in disposing of Southern Pacific's claim. In neither event would Matson be liable under the rule here adopted because in neither event is it a party to the railroad bill of lading under which the demurrage accrued.[5]

Turning now to those instances where Matson was named consignee on the railroad bill of lading, the Court observes that the holding set forth above does not necessitate a holding here that *anyone* named as consignee in a contract of transportation can be held liable for demurrage.

There is no evidence that Matson authorized shippers to consign goods to it or that it performed its task differently in those instances. In fact the sole difference between the two situations was the shipper's unilateral decision whom to name as consignee. The instant case differs in this respect from the others cited by the parties, where the consignee was either the purchaser of the cargo or, at least, the person to whom final delivery was to be made and who thus had an interest in and control over the cargo.

The Court reserves the question whether a consignee who has played an active role in the railroad transportation contract or has an interest in or control

over the goods may be liable for the demurrage. However, where, as here, a connecting carrier-consignee is merely named in the railroad bill of lading without either more involvement on its part, or some culpability for the delay, it cannot be held liable to the railroad for demurrage. Van Etten v. Newton, 134 N.Y. 143, 31 N.E. 334, 335 (New York Court of Appeals 1892). To hold otherwise on these facts would be to place a connecting carrier's liability totally within the shipper's control, a result the Court cannot sanction. See *Middle Atlantic, supra,* 353 F.Supp. at 1122. Missouri, K. & T. Ry. Co. of Texas v. Capital Compress Co., 50 Tex.Civ.App. 572, 110 S.W. 1014, 1016 (1908).

Southern Pacific relies upon American Export-Isbrandtsen L., Inc. v. Federal Mar. Com'n., 444 F.2d 824 (D.C.Cir. 1970), as authority that demurrage charges can be imposed on a party other than a shipper or consignee. That reliance, however, is misplaced. *American Export-Isbrandtsen* involved review of a Federal Maritime Commission order requiring harbor terminals to include in their tariffs compensation to truckers for unusual delays caused by the terminal's actions. Although the court upheld the Commission's order, the case is easily distinguished. First, *Isbrandtsen* involved FMC regulations and FMC tariffs, while in this case plaintiff-railroad comes under the control of the Interstate Commerce Commission. This difference is extremely significant, since the powers of the FMC are considerably broader than those of the ICC, as the court itself noted in *Middle Atlantic* to distinguish the earlier and arguably conflicting *Isbrandtsen* decision. 353 F.Supp. at 1123, n. 42.[7] Further, the ICC has

---

5. Although the court in *Middle Atlantic* treated the relationship between the warehouseman and the consignee as one of agency, that finding does not seem essential to its holding. Analyzing one of the authorities cited by plaintiff in the present case, the court in *Middle Atlantic* remarked:

"None of the cited cases decide that a warehouseman *or* [emphasis added] agent who is *not* named in a bill of lading as

consignor or consignee may be held liable for the payment of detention charges." *Middle Atlantic, supra,* 353 F.Supp. at 1119. (footnote omitted)

7. Interestingly, Judge MacKinnon wrote the opinions in both *Isbrandtsen* and *Middle Atlantic,* and his comments on the former case are thus entitled to great weight. Judge Tamm also sat on the two cases and concurred in Judge MacKinnon's opinions.

specifically and consistently held that one not a party to the contract of transportation cannot be charged demurrage. New York Board of Trade v. Director-General, *supra,* 59 I.C.C. at 209. Detention of Motor Vehicles–Middle Atl. & New England, *supra,* 318 I.C.C. at 607. The language in the *Board of Trade* opinion is particularly emphatic on this point:

"As already indicated, the steamship companies are usually responsible for the delays which result in demurrage, and the rail carriers attempt to collect the charges from them. But if the steamship company refuses to pay, the rail carrier has no recourse other than resort to the consignee, for the courts have decided that the steamship company is not a party to the contract of transportation over the rail lines and can not be held liable by the rail carrier for demurrage. See *Central R. Co. of New Jersey v. Anchor Line,* 219 F., 716." 59 I.C.C. at 209.

Secondly, the demurrage charges in *Isbrandtsen* were imposed only prospectively in contrast to the retroactive relief sought here. There also the terminals were liable only where they were responsible for the delay. Here Matson was not in any way at fault.[8] The shipments either had not been booked in advance or had arrived before the scheduled receiving time. While Matson has an obligation to provide reasonable facilities for unloading cargo, the evidence is uncontradicted that Matson's facilities were, in effect, fully utilized at the time of arrival of the shipments in question.

■ Plaintiff makes two further arguments. First, it contends that even if the Court adopts the *Middle Atlantic* rule, it should still prevail since Matson was not a stranger to the contracts of transportation. The Court recognizes that Matson was not a "stranger" to the contracts in the sense that it knew shipments would occasionally arrive unbooked or prematurely, but this fact alone does not make Matson a party to the contract with the ensuing liabilities that would follow from that status.

As an alternative argument, Southern Pacific asserts that the holding in *Middle Atlantic* ultimately rests upon a misreading of Central R. Co. of New Jersey v. Anchor Line, 219 F. 716, 718 (2d Cir. 1914). *Anchor Line* was a suit by a railroad to collect demurrage from a connecting common carrier by water. The applicable tariff provided for demurrage against the party "responsible for the delay." [9] *Anchor Line, supra,* 219 F. at 717. Although the court held that under the then applicable tariff no demurrage could be collected, the opinion does contain language suggesting that only the shipper or consignee, the parties to the contract, could in any event be held liable. Even if subsequent cases relying upon that language have misconstrued the actual holding in *Anchor Line,* the principle stated in *Middle Atlantic* has independent persuasive support for Matson's position and the Court follows it.

■ Southern Pacific's final argument is that at very least it should be allowed to recover on a "quasi-contract" theory. Since Matson had the "benefit" of the cars, the railroad argues, it is entitled to reasonable compensation for their use. The problem with this theory is that in no meaningful sense has Matson benefitted from the "use" of the cars. Matson had no way of knowing that the shipments were going to arrive too early or unbooked. If the shipper had notified Matson in advance, the latter could have advised the shipper

---

8. Even were Matson at fault, Southern Pacific would not necessarily prevail since neither the applicable tariffs nor the bills of lading provide that the person who causes car delay should be liable for demurrage.

Nor has the shipper here, in any event, signed the non-recourse provision of the bills of lading.

9. No such provision is found in any of Southern Pacific's tariffs. See footnote 8, *supra.*

of the proper time to send the goods. As it happened, Matson had no choice, its facilities being fully used, but to implicitly decline the shipments until space became available. The only one who could properly be said to have benefitted from the use of the cars is the shipper or the purchaser whose goods otherwise might have been returned or left unattended at the freight yards.

The Court believes that the decision reached in this case is in accordance with the general policies behind demurrage charges. In Penna R. R. Co. v. Kittanning Co., 253 U.S. 319, 323, 40 S.Ct. 532, 533, 64 L.Ed. 928 (1920), the Court pointed out that:

> "The purpose of demurrage charges is to promote car efficiency by penalizing undue detention of cars. The duty of loading and of unloading carload shipments rests upon the shipper or consignee. To this end he is entitled to detain the car a reasonable time without any payment in addition to the published freight rate."

As noted above, it was shipper's actions, or inactions, which necessitated the prolonged use of the railroad cars. Placing the resultant charges on Matson, who had no options open to it when the shipments arrived, would not promote efficiency in the use of scarce railroad facilities.

The Court is also not unmindful of Southern Pacific's potential costs should it now decide to sue numerous and scattered shippers or consignees. However, Southern Pacific is in the best position to discuss the problem with its shippers and to point out to them their potential liability under the applicable demurrage tariffs.

The above memorandum of opinion constitutes the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

It is hereby ordered that plaintiff's motion for summary judgment is denied and that defendant's motion for summary judgment is granted.

It is hereby further ordered that counsel for defendant shall prepare an appropriate form of judgment in this case and in the other related cases in accordance with this memorandum of opinion.