EVANS PRODUCTS CO., General American Transportation Corp., and Interstate Railcar Services, Inc., Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Chicago Heights. Terminal Transfer Railroad Company, Intervening Respondent.

TANK LINING CORP., Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

Nos. 82–3017, 83–1240.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1983.

Decided March 12, 1984.

Thomas F. McFarland, Jr., Belnap, Spencer & McFarland, Chicago, Ill., Robert P. VomEigen, Hamel, Park, McCabe & Saunders, Charles W. Chapman, Barnett & Alagia, Washington, D.C., for petitioners.

Dennis J. Starks, Interstate Commerce Commission, Washington, D.C., J.H. Durkin, Missouri Pacific R.R. Co., Chicago, Ill., for respondents.

Before WOOD and CUDAHY, Circuit Judges, and KELLEHER, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Petitioners, railroad car owners and operators of repair facilities, seek to have this court set aside the decision of the Interstate Commerce Commission in *Switching Charges for Privately-Owned Cars Billed to Repair Facilities*, No. 38792 (Oct. 12, 1982). The Commission declined to find unreasonable and violative of the Interstate Commerce Act, 49 U.S.C. § 10701 (Supp. V 1981), a supplemental item in the

tariff of a terminal switching rail carrier, Chicago Heights Terminal Transfer Railroad Company (CHTT). The tariff item charges rail car repair facilities for switching empty cars on their way to and from repair shops. We enforce the Commission's decision to terminate proceedings challenging the tariff, thus allowing this carrier to charge for empty repair switches; however, we set aside that much of the Commission's decision that allows assessment of repair switching charges against repair facilities.

I.

A brief review of the railroad transportation system is helpful to an understanding of the present dispute. Railroad common carriers are required to offer shippers complete transportation services; as part of these services, carriers must provide shippers with the cars in which freight is moved. *See Pennsylvania Railroad Co. v. Puritan Coal Mining Co.*, 237 U.S. 121, 35 S.Ct. 484, 59 L.Ed. 867 (1915); *In the Matter of Private Cars*, 50 I.C.C. 652 (1918); 49 U.S.C. § 11121 (Supp. V 1981). Because the cars in the railroads' fleet often were not promptly available to shippers or were not adapted to the special needs of certain goods, a privately-owned car industry grew to provide cars as necessary for use as instrumentalities of transportation.[1] *Private Cars*, 50 I.C.C. at 657–58. While the Commission does not regulate private car owners, which are not common carriers, the Commission has regulatory authority over the operation of private cars through control over the railroads. *Ellis v. ICC*, 237 U.S. 434, 443–44, 35 S.Ct. 645, 646–47, 59 L.Ed. 1036 (1915); *Private Cars*, 50 I.C.C. at 677.

The Interstate Commerce Act gives the Commission jurisdiction to determine the compensation paid for the use of freight cars, which is to include the costs of repairs. 49 U.S.C. § 11122 (Supp. V 1981).

---

* The Honorable Robert J. Kelleher, Senior District Judge for the Central District of California, is sitting by designation.

1. We will refer to owners who use their cars (*i.e.*, shippers) or who lease their cars to shippers or railroads as owners/lessors.

Since 1918, the Commission has administered a nationwide system of compensating private car owners for owning and maintaining the cars that railroads otherwise would have to supply. *See Private Cars,* 50 I.C.C. 652 (1918). The Commission promulgates a mileage allowance tariff that is assessed against the railroads and distributed among the private car owners.[2] Railroads factor in the amount they must pay under the mileage allowance tariff when setting their own freight tariff rates.

When newly manufactured cars are transported on their own wheels, not yet carrying goods, or when old cars are on their way to permanent retirement, these cars are not instrumentalities of transportation but are property for which freight charges must be levied. *See Indiana Harbor Belt Railroad Co. v. General American Transportation Corp.,* 577 F.2d 394, 401 (7th Cir.1978) (*IHB II*); *Mileage Allowance, Tank Cars Between Points in the United States,* 337 I.C.C. 23 (1970); 49 U.S.C. § 10761 (Supp. V 1981). Rail cars that have entered the national fleet and are in use shipping goods generally are considered instrumentalities of transportation for which no freight charges for their movement may be imposed. *See IHB II,* 577 F.2d at 401. Because ordinary repairs enable cars to continue transporting goods, the movement of empty cars to and from repair facilities (repair switches) does not alter the cars' status as instrumentalities of transportation. *Id.* at 400; *cf. Atchison, Topeka and Santa Fe Railway Co. v. Union Tank Car Co.,* 611 F.2d 1184 (7th Cir. 1979) (lessee's use of cars in Mexico interrupted commitment of cars to national fleet; transportation charges may be levied for movement of cars for repairs). Repair switches are not distinct rail services for which a direct charge may be made. *IHB II,* 577 F.2d at 400–01 (citing *Union Tank Car Co.,* 268 I.C.C. 338, 341 (1947)).

CHTT is a terminal switching carrier with six and one-half miles of mainline track. It provides switching services to six connecting line-haul carriers, including its parent, the Missouri Pacific Railroad Company (MoPac), and to forty-six industries and three repair facilities located on its line. A car manufacturing and repair facility, Thrall Manufacturing Company, was located on CHTT track prior to 1978; in 1978 two other repair facilities, Interstate Railcar Service, Inc., and Tank Lining Corporation, established operations on CHTT tracks.

CHTT never has participated in the mileage allowance tariff. It appears that CHTT had collected direct charges for switching empty cars to and from repair facilities on its line for some time prior to 1982, when it filed the tariff item at issue here. Until 1978, in-bound line-haul carriers that delivered empty cars to CHTT collected the charges for repair switches, apparently from private car owners, and remitted the payments to CHTT.

In 1978, two of the line-haul carriers that handled most of CHTT's in-bound traffic discontinued the practice of paying CHTT for empty repair switches. CHTT claims to have had difficulty collecting the charges itself from the private car owners. In 1982, CHTT filed a supplement to its General Revenue Tariff, stating:

> Switching charges as provided herein for movement of empty privately-owned or railroad-owned cars, moving on own wheels, to or from repair facilities will be collected from the repair facility ordering cars from or to said repair facility.

---

2. Despite the argument to the contrary of intervening respondent CHTT, switching carriers are exempt neither from the general obligation to provide rail cars nor from the mileage allowance tariff that compensates private car owners. *See Indiana Harbor Belt Railroad Co. v. General American Transportation Corp.,* 577 F.2d 394, 399–400 (7th Cir.1978) (*IHB II*) (citing *Cancellation of Private Car Allowances,* 322 I.C.C. 565 (1964), *aff'd sub nom. Baltimore and Ohio Chicago Terminal Railroad Co. v. United States,* 279 F.Supp. 270 (N.D.Ill.) (three-judge panel), *aff'd,* 389 U.S. 88, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967)). Occasionally, however, line-haul carriers have assumed their connecting switching and terminal carriers' obligations to provide cars to shippers, *see, e.g., Rules Governing Handling of Fresh Meat,* 132 I.C.C. 49, 51 (1927), and to pay the mileage allowance tariff, *see, e.g., Cancellation of Private Car Allowances,* 322 I.C.C. at 570.

**1110**

Private car owners and operators of repair facilities opposed the tariff, prompting a Commission investigation. On October 12, 1982, Division 2 of the Commission decided to discontinue the investigation and let the tariff stand.

In this consolidated appeal, petitioning private car owners and operators of repair facilities maintain that: (1) the Commission erred by respecting the separate corporate structure of CHTT and MoPac in assessing the benefit derived from the use of private cars; (2) the Commission changed its policy arbitrarily and contrary to the substantial evidence by allowing the collection of charges for empty repair switches; and (3) the Commission approved an unlawful assessment of such charges against repair facilities.

## II.

■ The crucial test for whether a rail carrier may charge for empty repair switches turns on whether the carrier derives some economic benefit from the private ownership of rail cars. *See IHB II,* 577 F.2d at 400–01; *infra* section III. When a carrier attempts to charge for repair switches, a preliminary finding of *who* is the charging party must be resolved before we turn to the question of whether that carrier benefits from the private car system. The Commission claims that benefit only to CHTT need be considered; petitioners desire to pierce the corporate veil to consider the economic benefit to CHTT's parent, MoPac.[3] In the proceedings below, the Commission refused to look beyond CHTT because it found no strong evidence that the corporate form was ignored or abused, relying on language in its decision that this court affirmed on other grounds in *IHB II. See General American Transportation Corp. v. Indiana Harbor Belt Railroad Co.,* 357 I.C.C. 102, 127 (1977).

On appeal, petitioners provide a list of functions that CHTT and MoPac perform jointly, such as sharing officers and directors, employees, cars, and a logo. Yet no evidence is presented to show that the separate corporate structure is maintained to avoid a clear legislative purpose, *see Schenley Distillers Corp. v. United States,* 326 U.S. 432, 437, 66 S.Ct. 247, 249, 90 L.Ed. 181 (1946), or to defeat an overriding public policy, *see Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.,* 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974). CHTT and MoPac have been incorporated separately since they were formed as independent companies years ago; their corporate forms were retained after the Commission denied the application for merger of CHTT into its then-parent C & EI in 1961. That CHTT's new parent, MoPac, has not sought to merge CHTT into it after the liberalization of Commission merger rules cannot be seen as a deliberate attempt to flout legislative policy.

Viewing the totality of the circumstances, the corporate form was adopted consistently with the national transportation policy, and need not be disregarded simply because in this case the form enables CHTT to acquire an advantage that presumably would not be available to its parent. The Commission's decision to respect the existing corporate structure was not arbitrary and capricious.

## III.

■ Petitioners assert that the Commission arbitrarily altered its policy as set forth in *IHB II* by allowing CHTT to charge for repair switches outside the mileage allowance tariff. The Commission responds that its decision not only is supported by adequate findings and is consistent with established policy, but is dictated

---

**3.** CHTT maintains a separate identity, but is a wholly-owned subsidiary of MoPac. CHTT was incorporated in 1898. Chicago and Eastern Illinois Railroad Company (C & EI) acquired CHTT in 1927. In 1961, C & EI attempted to merge CHTT into it, but the Commission denied the application. *Chicago & Eastern Illinois Rail-* *road Co. Merger, Chicago Heights Terminal Transfer Railroad Co.,* 312 I.C.C. 564 (1961). C & EI merged into MoPac in 1976. *Missouri Pacific Railroad Co. Merger, Texas and Pacific Railway Co. and Chicago and Eastern Illinois Railroad Co.,* 348 I.C.C. 414 (1976).

by application of the *IHB II* economic benefit test. We must review the decision to determine whether it is within the Commission's statutory authority, supported by substantial evidence, based on specific findings of fact from the record, and founded on a rational basis. *IHB II*, 577 F.2d at 397. We note the judicially recognized need to give an administrative agency the latitude necessary to carry out the purpose of its authorizing statute. *Illinois Central Gulf Railroad Co. v. ICC*, 720 F.2d 958, 961 (7th Cir.1983). The Commission is not limited by specific statutory enumerations, 49 U.S.C. § 10321(a) (Supp. V 1981), and we must give deference to the agency in interpreting its own statute, *Baltimore and Ohio Chicago Terminal Railroad Co. v. United States*, 583 F.2d 678, 683 (3d Cir. 1978), *cert. denied*, 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979).

The *IHB II* case, like this appeal, involved a challenge to the prohibition of a direct charge for empty repair switches. The Indiana Harbor Belt Railroad Company (IHB), like CHTT here, attempted to collect a direct charge for switching unloaded cars to and from repair facilities. The Commission found this charge unreasonable, and we enforced its decision. IHB was an intermediate switching carrier that participated in the mileage allowance tariff, yet wanted to recover what would be double payment for unloaded repair switching— once through its tariff charge for loaded movements that takes into account the mileage allowance tariff, and again via the direct charge. We affirmed the Commission's conclusion that the tariff for the direct charge was unreasonable, accepting the Commission's finding that "IHB derives substantial benefits, both direct and indirect, from the loaded movements of private cars over its line, [so] that such cars constitute instrumentalities of transportation essential to the fulfillment of IHB's common carrier obligations ...." *Id.* at 400.

The Commission here asserts that its approval of CHTT's tariff item charging for empty repair switches is not a retreat from *IHB II;* rather, the Commission argues that CHTT does not meet the *IHB II* economic benefit test. If a carrier does not derive substantial benefit from the loaded movements of private cars over its line, the Commission argues, by definition the private cars are not instrumentalities of transportation as to that carrier and it may charge directly for repair movements. In the instant action, the Commission found that CHTT, unlike IHB, "cannot be said to receive sufficient benefit from the movement of private cars to warrant considering the empty cars as instrumentalities of transportation" as to it. *Switching Charges*, slip op. at 8.

In concluding that CHTT receives insufficient benefit, the Commission found several factual differences between CHTT and IHB. Most importantly, the Commission noted that CHTT is a small terminal switcher, while IHB is a large intermediate switcher making many more connections and deriving substantial revenue from loaded switching movements. CHTT, the Commission determined, is too small to benefit from participation in the mileage allowance tariff.[4] *Id.* While the Commission decision may not be a model record of findings of fact, the Commission adequately explained the findings upon which it based its decision. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974) ("we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

Furthermore, on appeal, the Commission analogizes CHTT to the East Camden and Highland Railroad Company (EC & H), a line-haul carrier whose direct charge for repair switches met with Commission approval in its *Indiana Harbor Belt* decision, 357 I.C.C. at 131. Like CHTT, EC & H was

---

**4.** The Commission considered the fact that CHTT had charged for empty repair switches for years and had never been a party to the mileage allowance tariff, but acknowledged that such prior behavior did not make the tariff charge lawful. *Switching Charges*, slip op. at 6–7.

not a party to the mileage allowance tariff. EC & H received no or substantially no revenue from the movement of privately-owned cars over its line.[5] *Id.* While CHTT admittedly does receive some revenue from private car movements,[6] the Commission was within its statutory authority and acted rationally in concluding that CHTT's revenues were below the threshold necessary to constitute an economic benefit to it under the *IHB II* test.[7]

Petitioners also urge us to deny enforcement of the Commission decision as discriminatory. The Commission has held that no unjust discrimination occurs in favor of users of carrier-owned cars when a carrier that does not benefit from the use of private cars publishes separate rates for switching private cars. *Indiana Harbor Belt,* 357 I.C.C. at 135. Also, the Commission does not unfairly favor repair facilities that happen to be located along the lines of carriers that are barred from assessing a separate charge for repair switches. The circumstances of the repair facilities located on the tracks of a carrier which may levy a direct charge for repair switching may be unfortunate, but do not amount to unlawful discrimination. Other factors also may result in advantage to certain repair facilities, such as being located along a direct route of movement where car owners/lessors may prefer to conduct repairs regardless of any charge for repair switches, yet such factors do not constitute discrimination.

## IV.

■ Petitioners finally challenge the authority of the Commission to approve a tariff that assesses the charge for repair switches against repair facilities. Here the issue is not the propriety of imposing such a charge, which we already have upheld, but the propriety of imposing such a charge against repair facilities. Petitioners argue that the Commission lacks authority to approve a tariff assessing transportation charges against one who is not a consignor, consignee, or owner of the property transported or is not bound by contract, statute, or under prevailing custom. Repair facilities, they argue, offer a service incidental to the transportation function and, by ordering switches for cars, perform merely a ministerial act on behalf of car owners/lessors.

The Commission argues in response that CHTT was forced to charge repair facilities directly because it had difficulty collecting the switching charge from the owners/lessors of the cars.[8] Repair facilities, the Commission argues, establish a contractual relationship with CHTT by ordering switches for cars coming in for repairs or at least have a contractual relationship with the owners/lessors to perform the repairs, and act as independent contractors or agents in ordering the repair switches.

By finding that CHTT does not derive sufficient benefit from the use of private rail cars, the Commission implicitly concluded that private cars are not instrumentalities of transportation as to CHTT, but are property. *Cf. IHB II,* 577 F.2d at 400. A car may be an instrumentality of transportation as to one carrier but property as to another. *Indiana Harbor Belt,* 357

---

**5.** All switches to the one repair facility on EC & H's line were of privately-owned cars, and these empty repair switches constituted 18% of its total business. 357 I.C.C. at 107.

**6.** CHTT receives approximately 8% of its revenue from the loaded movement of private cars.

**7.** *Amicus curiae* Railcar Repair Association raises the concern that this case portends an abdication of the Commission's rail transportation policy. The Association cites a more recent Commission action that allowed IHB to charge for any empty movement not preceded by a loaded

revenue-generating movement on IHB lines. *Movement of Empty Cars To/From Facilities For Cleaning,* Suspension Case No. 70993 (Feb. 10, 1983). This charge would appear to conflict directly with the policy approved in *IHB II.* We note, however, that this appeal passes only on the Commission action in the CHTT case.

**8.** CHTT attempted to collect the charge from private car owners. Owners who used their own cars generally paid CHTT, but owners who leased their cars to shippers or railroads generally declined to pay, suggesting that the lessees ordering the switches should pay.

I.C.C. at 126. CHTT's switching charges on rail cars, property as to it, thus can be analyzed as a type of freight or transportation charge. Liability for freight charges may be imposed only against a consignor, consignee, or owner of the property, *see, e.g., Tank Lining Corp. v. Missouri Pacific Railroad Co.*, 598 S.W.2d 955, 958 (Tex. Civ.App.1980); *see also* 49 U.S.C. § 10744 (Supp. V 1981), or others by statute, contract, or prevailing custom, *see, e.g., Southern Pacific Transportation Co. v. Matson Navigation Co.*, 383 F.Supp. 154, 156 (N.D. Cal.1974); *Middle Atlantic Conference v. United States*, 353 F.Supp. 1109, 1118, 1120 (D.D.C.1972) (three-judge panel).

Repair facilities do not own the cars they repair and may not be assessed freight charges as owners. Although they receive cars and ship the repaired cars out again, repair facilities are not consignors or consignees of the cars because delivery of the cars as freight is not completed and the carrier's lien is not extinguished when the repair facility receives the car. Repair facilities do not determine the further disposition of the cars, but rather act at the behest of the car owners/lessors. *Cf. Southern Pacific Co. v. Brown, Alcantar & Brown, Inc.*, 409 F.2d 1331 (5th Cir.1969) (agent became diverting consignee of freight; liable for freight charges); *Pacific Coast Fruit Distributors, Inc. v. Pennsylvania Railroad Co.*, 217 F.2d 273 (9th Cir. 1954) (same).

There is no statutory liability here. There is also no prevailing custom to charge repair facilities. In fact, the charge against repair facilities is new altogether because, until this case, the Commission has refused to allow such charges, or charges were levied against in-bound linehaul carriers without objection, as CHTT claims it has done for years.

Finally, repair facilities have not contracted to assume liability for switching charges. The transportation contract is for shipment of goods, here the car itself, and is between the shipper, here the car owner/lessor, and the carrier. Attempts to support tariffs assessing freight charges against others tangentially involved in the shipment, such as "warehousemen, pier operators, brokers, steamship agencies and others similarly situated," *Middle Atlantic*, 353 F.Supp. at 1111, have failed. No liability exists merely on account of being named in the bill of lading, *City of New Orleans v. Rapid Truck Leasing, Inc.*, 348 So.2d 1299, 1301 (La.App.1977); or handling the property, *see, e.g., Middle Atlantic*, 353 F.Supp. at 1118; *Tank Lining Corp.*, 598 S.W.2d 955 (Tex.Civ.App.1980) (tank car lining business not liable for storage charges on cars hauled as freight); *Missouri, Kentucky, and Tennessee Railway Co. of Texas v. Capital Compress Co.*, 50 Tex.Civ.App. 572, 110 S.W. 1014 (1908) (cotton compressing facility not liable for demurrage charge; acted as · agent of freight owner).

The Commission argues alternatively that when ordering repair switches, repair facilities act as independent contractors or agents of undisclosed principals, the car owners/lessors, and thus may be held personally liable for switching charges. Repair facilities are not independent contractors of car owners/lessors when they order repair switches because, in performing this ministerial act, their only exercise of independent discretion is to determine when the repair shop has room for the car.

The possibility exists, of course, that repair facilities act as agents of the car owners/lessors in ordering the repair switches, with disclosure of the fact of agency, if not the identity of the principal. In the case of a partially disclosed principal, the agent may be held personally liable for the charges incurred on behalf of the principal. Restatement (Second) of Agency § 321 (1957). A repair facility thus could be held liable for the switches it orders if it refuses to disclose the identity of its principal. However, the possibility that repair facilities acting as agents will withhold the identities of their principals, and thus will assume contractual responsibility for those repair switching charges, is too broad a generalization to find its way into a tariff blanketly placing ultimate liability on the

repair facilities for all repair switches they order. Repair facilities, neither consignor, consignee, or owner, nor obligated by statute, contract, or prevailing custom, may not be named as liable for repair switching charges in CHTT's tariff.[9]

## V.

We enforce that much of the Commission's decision that permits the CHTT tariff item to impose a direct charge for empty repair switches. We set aside that much of the decision that allows assessment of this charge against repair facilities.

---

9. We do not leave CHTT with a valid repair switching charge but no one obligated to pay it. Depending upon the circumstances, CHTT could collect its repair switching charge from the car owner or car lessee, as consignor or consignee of the car as freight, or from a third party that has assumed liability by contract. Those properly chargeable may, but need not, be named in the tariff.