CSX TRANSPORTATION, INC., Plaintiff,

v.

The CITY OF PENSACOLA, FLORIDA d/b/a the Port of Pensacola, Defendant.

No. 94–30236–RV.

United States District Court, N.D. Florida, Pensacola Division.

June 30, 1995.

Larry Hill, Moore, Hill & Westmoreland, Pensacola, FL, for CSX Transportation Corp.

Don J. Caton, City of Pensacola, Office of the City Attorney, Pensacola, FL, Stephen C. Herman, Pro Hac Vice, Belnap, Spencer, McFarland & Herman, Chicago, IL, for City of Pensacola dba Port of Pensacola.

Danny L. Kepner, Shell, Fleming, Davis & Menge, Pensacola, FL, for ADM Milling Co.

O'Gwen L. King, King & Dessommes, Pensacola, FL, for Cargill Inc., Lauhoff Grain Company.

## ORDER

VINSON, District Judge.

Pending is the motion of defendant City of Pensacola for summary judgment. (doc. 9).

Except as noted, the following facts are undisputed in the record. Plaintiff CSX Transportation, Inc. ("CSX"), a Virginia corporation, is a rail common carrier, with its principal place of business in Jacksonville, Florida. Pursuant to the provisions of the Interstate Commerce Act [49 U.S.C. § 10101 et seq.], CSX has published and filed Tariff CSXT 8100 with the Interstate Commerce Commission ("I.C.C."). CSX's filed tariff includes rates for demurrage. The City of Pensacola ("the City"), a Florida municipal corporation, owns and operates the Port of Pensacola ("the Port"). Goods intended for export from the United States arrive at the Port, either by rail or truck, and are then loaded onto ocean-going vessels for transport by water.[1]

For about six months between January and July of 1993, the Port experienced unusual problems with congestion at its facilities.[2] As a result of this congestion, the Port sometimes failed to timely unload railcars that CSX had delivered to the Port and detained them longer than the period provided for in the bill of lading. At other times, the Port was unable to accept delivery of railcars from CSX, and the railroad was required to store the loaded cars at various other locations. Both actions, of course, prevented the railroad from utilizing the railcars for other purposes as quickly as it otherwise could have.

CSX filed a three-count complaint in this case, seeking to recover demurrage for railcars either actually or constructively delivered to the Port during the period January through July 1993. Count I sought demurrage under CSX's published tariff. Count II sought to recover damages on a quantum meruit theory, and Count III sought the same relief on a quasi-contract theory. Because the "filed rate doctrine" precludes a common carrier from recovering demurrage except pursuant to its published tariff, I dismissed Counts II and III with prejudice by my order of January 5, 1995. The plaintiff now seeks summary judgment on Count I. Although it has not filed a cross-motion for partial summary judgment, the defendant requests, in its memorandum in opposition, that it be granted partial summary judgment on the issue of liability. In short, this case turns on the legal issue of whether the Port is liable to CSX for demurrage charges when the Port caused the delays giving rise to the demurrage, but when the Port is not a party to the contract of transportation with CSX.

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. As the Supreme

---

1. Services provided by the Port, and for which it publishes a tariff, include unloading boxcars, palletizing goods, and temporarily storing goods pending loading. The Port does not load the goods onto ships. Instead, the shippers and vessel operators contract with private stevedores located at the Port for this service. CSX contends that despite their nominally private status, the stevedores are subject to such extensive control by the Port that they are employees of the Port. Although I find no support for CSX's position on this, the status of the stevedores is not a material fact, and need not be resolved here.

2. The Port contends that this congestion was caused by the late arrival of various ships; CSX contends that it was due to the negligence of the Port. It seems undisputed that, at least in part, the Port caused the delays.

Court of the United States has instructed, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987).

 However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id. See also Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

 On summary judgment motion, the record and all inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *See Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1502 (11th Cir.1993). However, in a case to be tried to the judge as the finder of fact, it is appropriate for the judge to draw inferences from the uncontested facts in the record, even if those inferences might be outcome determinative. *Coats and Clark, Inc. v. Gay,* 755 F.2d 1506, 1510 (11th Cir.1985); *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1124 (5th Cir.1978).

 For purposes of this case, demurrage is the fee a railroad charges for the undue detention of the carrier's railcars. It is intended to both compensate for the delay, and to promote efficiency by deterring undue delays. *Interstate Commerce Comm. v. Oregon Pacific Industries, Inc.,* 420 U.S. 184, 189–90,

95 S.Ct. 909, 913, 43 L.Ed.2d 121, 126 (1975) (citing *Turner, Dennis & Lowry Lumber Co. v. Chicago, Milwaukee & St. Paul Railway Co.,* 271 U.S. 259, 262, 46 S.Ct. 530, 531, 70 L.Ed. 934, 938 (1926)). As a regulated common carrier, CSX is required to file a tariff schedule with the I.C.C. in which all of its freight rates and miscellaneous charges, included demurrage, are specified. 49 U.S.C. § 10762(a)(1). A carrier may not collect at a different rate for a service included in its filed tariff, even with the consent of the other party. 49 U.S.C. § 10761(a).

The Port was not a party to the contract of transportation on any of the shipments which were delayed. CSX also admits that the Port was never listed on the bills of lading as owner, consignor, or consignee of the shipment. In a few cases, the bill of lading indicated the goods were to be shipped to the legal consignee "in care of" the Port. Nevertheless, CSX asserts that the Port was the consignee for purposes of its tariff.

 The Port contends that since it was not a party to any of the contracts for shipment, it is not liable for demurrage as a matter of law. In support of its motion, the City relies upon two district court cases: *Southern Pacific Transportation Co. v. Matson Navigation Co.,* 383 F.Supp. 154 (N.D.Cal.1974), and *Middle Atlantic Conference v. United States,* 353 F.Supp. 1109 (D.D.C.1972) (three judge court). On the other hand, CSX has cited no caselaw in support of its position. I have discovered only two other reported cases dealing with this issue. *Southern Railway System v. Leyden Shipping Corp.,* 290 F.Supp. 742, (S.D.N.Y.1968); *Tank Lining Corp. v. Missouri Pacific Railroad Co.,* 598 S.W.2d. 955, 959 (Tex.Civ.App.1980). Doubtless, as noted by the court in *Middle Atlantic Conference v. United States, supra,* "The dearth of precise precedent is attributable to the rarity of attempts by carriers to hold persons liable for demurrage who were not parties to the contract." 353 F.Supp. at 1116.

[9] The three-judge court in *Middle Atlantic Conference* extensively analyzed the historical background of demurrage in maritime law, and the modern development of the

concepts of demurrage (pertaining to railroads) and detention (pertaining to motor carriers) in the common law. 353 F.Supp. at 1113. Prior to the coming of railroads, liability for the demurrage of ships was recognized in maritime law, and the shipper and consignee were deemed to have contracted with the master of the ship, so that the ship's cargo was liable for demurrage. 353 F.Supp. at 1114. The ship owner's right to demurrage ran to the freight, therefore, and was not dependent upon a specific contract with either the shipper or the consignee or upon any doctrine of agency. However, contracts involving land based common carriers are governed by the principles of common law, and not maritime law. *Id* at 1115. There is no such "deeming" principle in the common law, and contracts for the shipment of goods by land are governed by the terms of the transportation contract. Therefore, the three-judge court concluded that the I.C.C. may not legally require a warehouseman who is not a party to the contract to be liable for demurrage or detention on land based contracts, even though the warehouseman caused the delay. *Id. See also, Southern Pacific Transp. Co. v. Matson Navigation Co., supra,* 383 F.Supp. at 156; *Southern Railway System v. Leyden Shipping Corp., supra,* 290 F.Supp. at 745; *Tank Lining Corp. v. Missouri Pacific Railroad Co., supra,* 598 S.W.2d at 959. Thus, all the reported opinions agree that only a party to the rail transportation contract may be liable for demurrage. These cases reflect the I.C.C.'s position as well: "Further, the I.C.C. has specifically and consistently held that one not a party to the contract of transportation cannot be charged demurrage." *Southern Pacific Transp. Co. v. Matson Navigation Co., supra,* 383 F.Supp. at 157–58.

■ In its response to the City's statement of uncontested facts, CSX repeatedly asserts that the Port is a consignee under the terms of its filed tariff. The plain language of the tariff leaves a lot of doubt regarding CSX's assertion. However, even if so, it is not controlling. The unilateral action of one party in labeling an intermediary as a consignee does not render the putative consignee liable for demurrage. *See Southern Pacific Trans. Co. v. Matson Navigation Co.,*

383 F.Supp. at 157; *Missouri, K. & T. Railway Co. of Texas v. Capital Compress Co.,* 110 S.W. 1014, 1016 (Tex.Civ.App.1908). There is simply nothing in the record to indicate that the Port contractually agreed in the transportation agreement to be responsible for CSX's demurrage. CSX's demurrage claims lie against the parties shipping or receiving under the contract for transportation of the goods, and not the Port.

■ CSX contends that even if the Port is not contractually liable, it is statutorily liable, citing I.C.C. regulations promulgated pursuant to Title 46, United States Code, Section 816:

No terminal tariff shall contain provisions that exculpate or otherwise relieve marine terminal operators from liability for their own negligence, or that impose upon others the obligation to indemnify or hold-harmless the terminals from liability for their own negligence.

46 C.F.R. § 515.7 The Port's own filed tariff provides that the Port is not liable for demurrage, but also acknowledges (in compliance with the above regulation) that it is not relieved of responsibility for its own negligence. Section III, Item 311 of the Port's tariff states:

Subject: DEMURRAGE OR DETENTION

Application: The Port of Pensacola is not responsible for any delays, detention or demurrage on rail cars, vessels, or trucks.

Nothing contained herein shall be deemed to exculpate or relieve the Port from liability from the negligence of the Port.

CSX asserts that since the Port's negligence allegedly caused the delays and detentions which form the basis of its demurrage claims, the regulation imposes liability. But the regulation merely prohibits any exculpatory clause purporting to relieve the Port of liability caused by its own negligence. The regulation does not independently constitute a basis for demurrage liability where none otherwise exists.

The Port's tariff does, of course, prohibit the Port from exculpating itself from liability for its own negligence. If the Port's negli-

gence results in the parties to the transportation contract being required to pay demurrage to CSX, it would appear that those parties may have a claim against the Port under the language of the tariff. However, that is not this case. There is nothing in the language of the Port's tariff which can reasonably be construed as granting CSX ·a right to collect demurrage directly from the Port. As noted above, the I.C.C. requires all marine terminal operators to have such a provision in their tariffs. If this created liability for demurrage, presumably all marine terminals would be liable. However, the law seems well-settled that only the parties to the contract for the transportation of goods are liable for demurrage.

The only provision in the Port's tariffs that directly addresses the Port's responsibility for payment of demurrage is Section III, Item 337. It provides in pertinent part:

> When a railcar is not unloaded in a timely manner and such failure to unload is the result of a decision made by Port management in recognition of the necessity to operate the Port in an efficient manner, the Port of Pensacola may consider responsibility for demurrage.

This section of the Port's tariff provides that, although the Port has no legal liability for demurrage, if it is responsible for demurrage assessed, it will *consider* assuming liability for the demurrage. However, contrary to CSX's assertion, the Port's tariff does not impose liability for demurrage.

In its memorandum of law, CSX advances a different legal theory as the basis of Count I. Although not explicitly stated, CSX now seems to seek recovery in Count I on a breach of contract theory.

CSX has filed evidence in the record that various Port officials represented that, because the Port had caused the problem, the Port would voluntarily accept responsibility for the demurrage charges for which various shippers had become liable. Officials of the Port, as well as officials of the City, have publicly stated that the Port will pay CSX's demurrage, but that it contests the amount of the charges. CSX has also filed evidence in the record that ·the Port promised two shippers, ConAgra and ADM Milling, that it would pay the demurrage charges for which each was liable.[3] In short, CSX asserts in its memorandum that the Port breached express or implied contracts to assume liability for the demurrage debts owed to CSX by the shippers. As set forth in CSX's memorandum, its claim for demurrage has mutated into a breach of contract action.

As a matter of law, as a nonparty to the contracts for transportation of the goods, the Port is not directly liable for demurrage under CSX's filed tariff, and the defendant is entitled to summary judgment on Count I. Accordingly, the defendant's motion for summary judgment on Count I of the amended complaint is GRANTED, and it is DISMISSED. However, I specifically retain jurisdiction to entertain any supplemental jurisdiction motion regarding the plaintiff's contract claim and plaintiff is granted leave to file such, if there are proper grounds to so assert, within 60 days from the date of this order. I also specifically retain jurisdiction while this matter is under mediation, which I am ordering by separate order.

DONE AND ORDERED.

---

3. Presumably CSX is asserting that it can sue on these contracts as the intended third-party beneficiary. Of course, if the Port, rather than the shippers who were parties to the contracts for transportation, was liable .for demurrage, the Port's assurances that it would assume the shippers liability be superfluous and illogical.