In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-2957

ILLINOIS CENTRAL RAILROAD COMPANY,

*Plaintiff-Appellee,*

*v.*

SOUTH TEC DEVELOPMENT WAREHOUSE, INC.,

*Defendant-Third Party Plaintiff-Appellant,*

*v.*

R.R. DONNELLEY & SONS COMPANY,

*Third Party Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 5720—**George M. Marovich**, *Judge.*

ARGUED FEBRUARY 21, 2003—DECIDED JULY 23, 2003

Before CUDAHY, MANION and ROVNER, *Circuit Judges.*

CUDAHY, *Circuit Judge.* The Illinois Central Railroad Company (IC) sued South Tec Development Warehouse, Inc., seeking to recover demurrage charges assessed for rail shipments between September 1994 and December 1995. South Tec denied liability for the demurrage charges and joined R.R. Donnelley & Sons Company as a third party

defendant, arguing that Donnelley and not South Tec should pay any charges. Following a referral to the Surface Transportation Board (STB) for determinations on certain issues, the district court granted summary judgment to the IC and Donnelley, holding South Tec solely liable for the demurrage. South Tec appeals. Because we believe that key issues remain unresolved, we reverse and remand for reconsideration.

## I.

In 1991, the IC was courting the business of Donnelley, a printing company which receives a great deal of paper at its facility in Mattoon, Illinois. Donnelley had been using other carriers, but was interested in switching to the IC if the IC could provide a single-line, through rate for paper shipments that would actually make an intermediate stop at a warehouse for storage. The IC introduced Donnelley to South Tec, a warehouse in Kankakee, Illinois, that could store Donnelley's shipments. The entire arrangement was memorialized in two complementary contracts, one between the IC and Donnelley and the other between Donnelley and South Tec. There was no express contract between South Tec and the IC.

Under the agreements, boxcars of paper ultimately destined for Donnelley were first transported by the IC from Donnelley's paper suppliers to South Tec in Kankakee. Upon arrival in Kankakee, South Tec was responsible for unloading, categorizing, organizing and storing the paper, after which the railcars were released. When needed by Donnelley, the paper was reloaded onto either railcars or trucks for transportation to Mattoon. According to the agreement between the IC and Donnelley, the shipments on their way to South Tec were to be accompanied by bills of lading stating, "Car to Stop at South Tec Warehouse, Kankakee, Il. Freight Charges Cover Shipment to Ulti-

mate Destination," while the shipments as they continued on to Donnelley were to be covered by bills of lading stating, "This Is to Certify That Product Previously Moved in I.C.R.R. ROADHAUL to Kankakee, IL. Freight Charges Paid on Inbound Movement to Kankakee." In practice, the consignors of the shipments bound for South Tec used a wide variety of language to denote the shipments' destination. This arrangement apparently worked well, and South Tec and Donnelley renewed their contract in 1993.

Problems began in late 1994. Until then, South Tec had promptly unloaded the IC railcars as they arrived in Kankakee. However, starting in September 1994 and at least through December 1995, due in part to a dramatic increase in the amount of paper shipped, South Tec began to accumulate delays in unloading. According to the IC, so many cars piled up in the Kankakee railyard that the delay was affecting the IC's operations with respect to its other shippers. The IC began to assess demurrage charges against South Tec for these delays.[1] This assessment was thought to be in line with Item 2060-D of the IC's tariff, which provides that demurrage "will be billed to the consignor at origin, the consignee at destination and the party for whom the car is held if enroute." IC Freight Tariff IC 9000-F (issued Jan. 21, 1994), Memo. of Law in Supp. of Donnelley's Mot. for Entry of an Order to Stay These Proceedings and Referral to the STB Ex. 5, Record at 14 (IC Tariff). By the end of December 1995, a total of $160,170 in demurrage charges were billed to

---

[1] Demurrage is "a charge exacted by a carrier from a shipper or consignee on account of a failure on the latter's part to load or unload cars within the specified time prescribed by the applicable tariffs; the purpose of the charge is to expedite the loading and unloading of cars, thus facilitating the flow of commerce, which is in the public interest." Black's Law Dictionary 432 (6th ed. 1990).

South Tec but unpaid. Because of this balance and because South Tec's delays were threatening to "close down" the IC's Kankakee railyard, the IC imposed an embargo on the Donnelley shipments, leading Donnelley to assume responsibility for future demurrage charges in order to have the embargo lifted.

There still remains the unpaid $160,170 in demurrage charges that accrued up to December 1995. The IC sued South Tec in the Northern District of Illinois for these unpaid charges. South Tec claimed that it was not liable for these charges because it was not the consignee of the shipments, and joined Donnelley as a third party defendant. Donnelley moved to stay the district court proceedings and refer the case to the STB, which has exclusive jurisdiction over "transportation by rail carriers, and the remedies provided in [49 U.S.C. §§ 10101 et seq.] with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers." 49 U.S.C. § 10501(b)(1). Donnelley argued in its motion that three issues should be resolved by the STB: 1) whether the IC's demurrage charges were unreasonable, because the IC unilaterally modified its demurrage tariff allegedly in order to generate revenue rather than to promote the efficient use and distribution of freight cars, 2) whether the IC's tariff was unreasonable and discriminatory because it assessed demurrage charges for enroute delays, making shippers such as Donnelley potentially liable for demurrage at more than one location and 3) whether boxcar traffic of the type at issue was deregulated during the relevant time period. South Tec joined in this motion, which the district court granted in part. Pursuant to its decision, the district court asked the STB, 1) whether the IC's demurrage rate was unreasonable, 2) whether the method by which the IC calculated the charges was unreasonable and 3) whether the practice by which the IC's demurrage charges accrue is discriminatory with respect to shippers such as Donnelley.

The STB rejected all of Donnelley's and South Tec's arguments. *South-Tec Dev. Warehouse, Inc.*, STB Docket No. 42050 (Nov. 13, 2000), *available at* 2000 STB LEXIS 666 (*STB Decision*). However, while the STB found for the IC that demurrage charges could be assessed for the Kankakee delays, the STB declined to answer whether South Tec or Donnelley should be held responsible for these charges:

> South-Tec also argues that it was not the actual con-signee of any of the shipments for which IC seeks demurrage, but rather was Donnelley's agent, and therefore may not be held liable for demurrage charges on shipments destined for Donnelley.
>
> . . . [W]e find that there is a sufficient record before us to determine that IC could properly assess demurrage for South-Tec's undue delay of rail cars . . . , but that South-Tec's liability depends on whether or not it was acting as Donnelley's agent in its handling of the shipments. Because of deficiencies in the record, however, we can not resolve the agency question, which was raised by the parties, but which was not referred by the court.

*Id.* at 2-3.

Back in district court, all three parties moved for summary judgment. The district court reasoned that the only way that South Tec could have escaped liability was to have complied with 49 U.S.C. § 10743(a)(1), which requires a consignee that is an agent, in order to avoid liability for charges, to provide a carrier with written notice of its status as an agent prior to delivery. The district court found that because South Tec had not complied with the statute's notice requirement, it was liable for the demurrage charges even if it was acting as an agent for Donnelley in receiving the IC shipments. The district court also found that there was no indemnification agree-

ment between South Tec and Donnelley and granted summary judgment to Donnelley, defeating the third party complaint in a ruling not appealed. South Tec appeals the district court's grant of summary judgment to the IC.

## II.

We review a district court's grant of summary judgment de novo, examining the facts in the light most favorable to the opposing party and drawing all reasonable inferences in its favor. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). The district court's grant of summary judgment will be affirmed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

We begin our analysis by examining the basis for the district court's decision, and then we ask whether, despite its apparent errors, it might have reached the right result.

## A.

The district court here relied on two authorities: the STB's decision and 49 U.S.C. § 10743(a)(1). We find that the two do not fully support the district court's conclusions.

Going in reverse order, let us first consider 49 U.S.C. § 10743(a)(1):

§ 10743. Liability for payment of rates

(a) (1) Liability for payment of rates for transportation for a shipment of property by a shipper or consignor to a *consignee* other than the shipper

or consignor, is determined under this subsection when the transportation is provided by a rail carrier under [49 U.S.C. §§ 10101 et seq.]. When the shipper or consignor instructs the rail carrier transporting the property to deliver it to a *consignee* that is an agent only, not having beneficial title to the property, the *consignee* is liable for rates billed at the time of delivery for which the *consignee* is otherwise liable, but not for additional rates that may be found to be due after delivery if the *consignee* gives written notice to the delivering carrier before delivery of the property—

(A) of the agency and absence of beneficial title; and

(B) of the name and address of the beneficial owner of the property if it is reconsigned or diverted to a place other than the place specified in the original bill of lading.

(emphasis added). As recounted above, the district court relied on this statute to require that South Tec have given notice to the IC of its status as an agent of Donnelley. In applying this statute, however, the district court did not answer a critical preliminary question: Was South Tec a consignee? As emphasized above, the statute applies only to agents who are also consignees, and not to agents who are *not* consignees. *See Middle Atl. Conference v. United States*, 353 F. Supp. 1109, 1120 (D.D.C. 1972) (three judge panel) (noting that "a careful reading of [a predecessor of § 10743] . . . speaks only to . . . certain narrow situations of warehousemen . . . who appear as *consignees* on the bill of lading, but in no way can be read to impose liability on an agent not a party to the contract") (emphasis in original). In order for us to uphold the application of this statute, the district court or the STB must have found South Tec to be the consignee of the

disputed shipments. However, whether South Tec was a consignee is a question answered by neither the STB nor the district court.

We believe that this question was ignored because somewhat unclear language in the STB's decision led the district court to assume that the question of South Tec's consignee status, or its equivalent, had been answered in the affirmative. In its motion for summary judgment, the IC had argued to the district court that "[u]nder the clear language of the STB's order[,] if South Tec is Donnell[e]y's agent, then liability passes through South Tec to Donnell[e]y," and "[i]f South Tec is not Donnell[e]y's agent, then South Tec is liable directly." IC's Memo. in Supp. of Mot. for Summary J. at 3, Record at 34. The phrasing of this argument suggests that South Tec is liable in any event, but can be indemnified by Donnelley in the event that South Tec was Donnelley's agent. According to this argument, the IC *must* recover, from South Tec if not from Donnelley "through South Tec," its demurrage charges in the instant lawsuit. Apparently, the district court agreed with this reading of the STB's decision. *See* Tr. of Proceedings, Dec. 19, 2000, at 4 ("The question of who owes [the amount of the charges] is the question of agency. But it is owed."). The IC continues to argue before us, consistent with its earlier arguments and the district court's order, that the STB "dispositively ruled that South Tec may be held liable for [the] IC's claimed demurrage charge" and that the STB's decision stands as "res judicata" on the issue. IC Br. at 10-12.

This reading of the STB's decision is much too broad. While there is certainly some language in the STB's decision to support these conclusions, *see, e.g.*, *STB Decision* at 4-5 ("[O]nce South-Tec accepted the shipments, it (or Donnelley, if South-Tec was acting as Donnelley's agent) became liable for the demurrage charges."), the STB went to great lengths to explain that Donnelley, and

not South Tec, is liable if South Tec was acting as Donnelley's agent, *see, e.g.*, *id.* at 2, 3, 5. And, in the language of the STB's decision, whether South Tec was an agent is directly tied to the question of whether South Tec was a consignee. *See id.* at 2 ("South-Tec also argues that it *was not the actual consignee* of any of the shipments for which IC seeks demurrage, *but rather was Donnelley's agent*, and therefore may not be held liable for demurrage charges on shipments destined for Donnelley.") (emphasis added); *id.* at 6 ("IC's primary collection theory as to South-Tec—that South-Tec *was the consignee* of the shipments delivered to Kankakee *rather than an undisclosed agent*—can neither be proved nor disproved on this record.") (emphasis added). The STB had declined to address—appropriately, since the question was not referred to it[2]—whether South Tec was an agent *and* whether South Tec was a consignee. Both questions remained to be resolved by the district court.

Adding to the lack of clarity was the apparent approval by the STB of Item 2060-D of the IC's tariff, which provides that demurrage "will be billed to the consignor at origin, the consignee at destination and the party for whom the car is held if enroute."

> [South-Tec and Donnelley] also argue that IC's demurrage charges do not apply on their face because the tariff does not expressly provide for the collection of demurrage at a "storage-in-transit" point such as

---

[2] Any decision as to South Tec's consignee status would have been outside the scope of the issues referred to the STB by the district court and, therefore, only dictum. The issues referred to the STB did not involve the questions of *who or what was liable* for demurrage charges; they only involved the reasonableness of the charges and whether the way they were assessed was discriminatory. *See STB Decision* at 3 (noting that the agency question was not referred by the district court).

South-Tec's warehouse. [South-Tec and Donnelley] do not explain, however, why the "party for whom the car is held if enroute" language in the tariff is not broad enough to embrace South-Tec. Moreover, IC points out that South-Tec was not just a storage-in-transit point essential to the transportation, but was in fact identified on the bills of lading as the consignee of the shipments to its Kankakee warehouse. In those circumstances, once South-Tec accepted the shipments, it (or Donnelley, if South-Tec was acting as Donnelley's agent) became liable for the demurrage charges.

*STB Decision* at 4-5. Some of the parties and the district court may have read this passage to mean that parties responsible for loading and unloading at intermediate stopping points, e.g., a warehouse such as South Tec, could be held responsible for demurrage charges even if they are not consignees or consignors. Indeed, such an approach may even have some logical appeal, since South Tec was, arguably, most directly responsible for unloading the cars in a timely manner. This reading, however, is inconsistent with the language of both the tariff and the STB's decision.

The paragraph of the STB's decision quoted above merits detailed analysis. In the second sentence, the STB appears to endorse the collection of demurrage from South Tec by stating that the tariff is "broad enough to embrace South Tec." This sentence, however, must be read in conjunction with the previous sentence and the posture of the case before the STB. The first sentence poses the question being answered by the paragraph: whether demurrage can be collected "*at* a 'storage-in-transit' point such as South Tec's *warehouse*." *Id.* (emphasis added). Critically, we note that this is not the same question as whether demurrage can be collected *from South Tec*. The STB had before it South Tec and Donnelley as petitioners and the IC as respondent. In deciding that

the tariff was broad enough to apply to delays *at* warehouses, the STB held that *someone* could potentially be held liable for the Kankakee delays—in a sense, that the delays count as demurrage—but did not hold that South Tec itself could be held liable. Textually speaking, the last word of the second sentence of the passage quoted above refers not to South Tec the corporate entity, but to South Tec the location of the delays.

The question of who could be billed under the tariff is introduced in the latter part of the paragraph, which asks whether South Tec was just a storage-in-transit point or a consignee. As the STB's decision explains, South Tec becomes a properly billed party under the tariff "in [the] circumstance[ ]" that, as the IC argued, it "was not just a storage-in-transit point essential to the transportation, but was in fact identified on the bills of lading as the consignee of the shipments." *STB Decision* at 4. The implication of this statement is that South Tec cannot be billed under the tariff if it was not the consignee. In sum, while the tariff may be broad enough to include the Kankakee delays, *see STB Decision* at 4 (noting that the tariff may provide for demurrage assessment *at* a point such as South Tec's warehouse), the STB's decision imposes liability on South Tec only if South Tec was the consignee, and "not just a storage-in-transit point."

A close reading of Tariff Item 2060-D supports our understanding of the STB's decision. We read the last phrase of the relevant tariff, "the party for whom the car is held if enroute," to have two possible meanings. According to the first interpretation, there are two parties in some sense responsible for the demurrage here: the party *holding* the car (an agent such as South Tec) and "the party *for whom*" it is held (the principal, in this case, Donnelley). Under this interpretation, the tariff's language indicates that only Donnelley can be properly billed. This reading of the tariff is consistent with another tariff section, IC

Tariff Item 2000-A, which refers to *users* of the railroad rather than the railroad itself as the parties performing the holding. *See* IC Tariff Item 2000-A ("All railroad and privately owned cars held *for or by consignors or consignees* are subject to [the demurrage section of the tariff] . . . .") (emphasis added). According to the second interpretation, the IC is the holder of the car, while either South Tec or Donnelley is "the party for whom" it is held. This interpretation, under which South Tec becomes a billable party under the tariff even though not a consignee, is the one that the IC would have us believe the STB adopted.[3] We note, however, that this reading of Tariff Item 2060-D is inconsistent with Tariff Item 2000-A. *Id.* (suggesting that cars are held by users of the railroad, rather than by the railroad itself). And it is inconsistent with the significance placed by the STB on South Tec's consignee status.[4]

---

[3] Or, perhaps, the IC is arguing that South Tec was both the holder of the cars *and* the party for whom the cars were held. Because the tariff reads "the party for whom the car is held" rather than the simpler "the party holding the car," we are not inclined, under these facts, to collapse the party holding and the party for whom held into one entity.

[4] One might ask why, if "the party for whom" cannot refer to non-consignees, this "third category" of properly billed parties is included in the tariff at all. From its context, we understand "the party for whom" to refer to either the consignee or the consignor. That is, according to Tariff Item 2060-D, demurrage "at origin" is charged to the consignor, demurrage "at destination" is charged to the consignee and demurrage "enroute" is charged to the consignor or the consignee, depending on for which the car is being held. Although no consignor's liability is at issue here, consignor liability might enter the picture if an excessive volume of shipments coupled with other factors contributed to the conditions justifying demurrage charges. In other words, there may well be situations in which "the party for whom" a car is

(continued...)

A review of the case law reveals that whether South Tec was the consignee is properly the central issue here. *See, e.g.*, *Union Pac. R.R. Co. v. Ametek, Inc.*, 104 F.3d 558, 563 (3d Cir. 1997) (holding that demurrage could not be assessed against a warehouse that was not a consignee or other party to the transportation contract); *Middle Atl. Conference*, 353 F. Supp. 1109 (holding in an exhaustive opinion that a proposed tariff was unlawful to the extent that it attempted to impose liability for demurrage charges upon non-parties to the transportation contract). If South Tec was not the consignee, the case law supports imposition of liability against South Tec only under very limited circumstances. "Liability for freight charges may be imposed only against a consignor, consignee, or owner of the property, or others by statute, contract, or prevailing custom.*"Evans Prods. Co. v. Interstate Commerce Comm'n*, 729 F.2d 1107, 1113 (7th Cir. 1984) (citations omitted).[5] The IC has not indicated any applicable statute holding non-consignees responsible for demurrage charges. We are convinced by the comprehensive survey of the law in *Middle Atlantic Conference*, 353 F. Supp. at 1116-20, that no industry-wide custom permits such a practice. Thus, we are left with the conclusion that South Tec would

---

(...continued)

held at an intermediate point may be the consignor rather than the consignee.

[5] We rejected, in *Evans Products*, 729 F.2d at 1113-14, the theory that the general rule of agency law that an agent that refuses to disclose the identity of its principal is personally liable for charges incurred on behalf of the principal, *see* Restatement (Second) of Agency § 321, permits railroads to broaden their tariffs to reach non-consignee agents. As the Restatement makes clear, this rule of law only applies where an agent is actually entering into a contract on behalf of the principal. Here, it does not appear that South Tec ever entered into an agreement with the IC.

be liable only if it were a consignee or if it contractually assumed responsibility for the demurrage charges. *See Ametek*, 104 F.3d at 563 (noting that a non-consignee agent can contractually assume liability for demurrage charges); *Middle Atl. Conference*, 353 F. Supp. at 1121-22 (same).

### B.

Was South Tec a consignee? The IC pleaded in its initial complaint that South Tec *was* the consignee of the disputed shipments, perhaps in recognition of the fact that non-consignees generally cannot be held responsible for demurrage charges. *See* IC Complaint, para. 8, Record at 1. In applying 49 U.S.C. § 10743(a)(1), the district court seemingly assumed that South Tec was a consignee, perhaps out of a mistaken belief that the STB had decided the issue. Although we believe that the consignee status of South Tec is an issue best considered by the district court on remand, we briefly consider whether the district court's assumption that South Tec was a consignee may have been correct.

Two district courts have addressed somewhat analogous situations. In *CSX Transportation, Inc. v. City of Pensacola*, 936 F. Supp. 880 (N.D. Fla. 1995), a railroad sought to recover demurrage fees assessed against the Port of Pensacola. The *Pensacola* court held that because the Port was not a party to the transportation contracts under which the shipments to the Port were made, the Port, as a matter of law, could not be held liable for demurrage assessed under the railroad's tariff. *Id.* at 885. The *Pensacola* court relied on the fact that none of the bills of lading on shipments to the Port listed the Port as a consignee. *See id.* at 884.

In *Southern Pacific Transportation Co. v. Matson Navigation Co.*, 383 F. Supp. 154 (N.D. Cal. 1974), a railroad

sought to recover demurrage charges assessed against Matson, which received railroad shipments that were sent onward by sea to their final destinations in Hawaii. On most of the shipments, Matson was not listed as a consignee on the bills of lading. The district court held that, as long as Matson was not listed on the bills of lading as the consignee, Matson could not be liable for demurrage charges because Matson was not a party to the transportation contract under which the shipments were made. *Id.* at 157. With respect to the shipments where Matson *was* listed on the bills of lading as the consignee, the court held that if "the sole difference between the two situations was the shipper's unilateral decision whom to name as consignee," that unilateral action was not enough to make Matson a party to the transportation contract and liable for demurrage fees. *Id.* at 157-58; *see also Evans Prods. Co.*, 729 F.2d at 1113 ("No liability exists merely on account of being named in the bill of lading . . . .").

The facts here are similar to those in *Matson*. According to South Tec, ninety percent of the freight moving through South Tec was from the paper supplier Champion, which consistently named Donnelley as the consignee of the paper it shipped. *See* Def.'s Rule 56.1(A)(3) Statement, at para. 7 & Webber Aff. Ex. A., Record at 30. The agreement between the IC and Donnelley actually required that the bills of lading list South Tec as a "stop," with Donnelley as the "ultimate destination." *Id.* at Beaumont Dep. Ex. 2.

In its appellate brief, the IC makes no detailed argument as to why South Tec was a consignee (and therefore liable for demurrage), relying instead on its argument that the STB's decision was "res judicata" as to South Tec's liability. The IC's theory as to South Tec's consignee status appears to stem from South Tec's being listed as the consignee on some of the bills of lading for the paper

shipments. As noted above, however, being listed by third parties as a consignee on some bills of lading is not alone enough to make South Tec a legal consignee liable for demurrage charges, although it, coupled with other factors, might be enough to render South Tec a consignee. From the actions of the IC as reported by South Tec, it is apparent that the IC understood South Tec not to be a consignee but an agent for Donnelley. *See id.* at para. 12 ("The IC delivered to South Tec shipments for which the bills of lading never even mentioned South Tec or Kankakee, but rather, identified only Donnelley or some other entity as consignee and only Matoon, IL as the destination."). To the extent that some form of notice may play a role in the determination of consignee status, *see R. Franklin Unger, Trustee of the Ind. Hi-Rail Corp., Debtor—Pet. for Decl. Order—Assessment and Collection of Demurrage and Switching Charges*, STB Docket No. 42030 at 6 n.13 (June 14, 2000), *available at* 2000 STB LEXIS 333, at *11 n.13; *but see supra* note 2, it appears that the IC had ample notice of the relationship between South Tec and Donnelley.

On remand, guided by the principles that we have discussed, the district court should attempt to determine who was the legal consignee (or consignees) of the paper shipments in question and presumably liable for the demurrage charges. The district court may also consider whether South Tec contractually assumed responsibility for the demurrage charges, although the record currently shows no such assumption. To the extent that the agency status of a legal consignee may be a factor, the notice provisions of 49 U.S.C. § 10743(a)(1) may still be relevant.

### III.

Therefore, the judgment of the district court is REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*