John A. CARMICHAEL, Plaintiff,

v.

J.D. RICHARDS, Defendant.

No. IP 02–0992–C–K/T.

United States District Court, S.D. Indiana, Indianapolis Division.

March 8, 2004.

David L. Byers, Holwager Byers & Caughey, Beech Grove, IN, for Plaintiff.

Tom G. Jones, Jones Hoffman & Admire, Franklin, IN, for Defendant.

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

BAKER, United States Magistrate Judge.

### I. Introduction.

While incarcerated in the Johnson County Jail, Marcus Carter stabbed his cellmate, Plaintiff John A. Carmichael, in the eye with a pencil. As a result, Carmichael sued then-sheriff J.D. Richards for state law negligence and pursuant to 42 U.S.C. § 1983, both individually and in his official capacity, claiming that Richards violated Carmichael's Eighth Amendment right to be free from cruel and unusual punishment. Specifically, Carmichael alleges that Richards failed to take reasonable measures to ensure Carmichael's physical safety because of a policy that allowed maximum security inmates to be celled with medium security inmates. Additionally, Carmichael alleges that his Eighth Amendment rights were violated when Richards failed to provide Carmichael with necessary medical care. Before the Court are two separate motions for summary judgment filed by Richards. Richards' first summary judgment motion is dispositive of this matter.

### II. Summary Judgment Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Illinois Cent. R. Co. v. South Tec Development Warehouse, Inc.,* 337 F.3d 813, 816 (7th Cir.2003). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Abrams v. Walker,* 307 F.3d 650, 653 (7th Cir.2002), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Butera v. Cottey,* 285 F.3d 601, 605 (7th Cir.2002).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *See Michael v. St. Joseph County,* 259 F.3d 842, 845 (7th Cir.2001). To successfully oppose Richards' motions for summary judgment, Carmichael must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y,* 250 F.3d 1136, 1141 (7th Cir.2001). A scintilla of evidence in support of the non-movant's position is not sufficient to defeat a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

### III. Background.[1]

As Sheriff of Johnson County, Richards maintained ultimate responsibility for set-

---

1. The facts of this case are largely undisputed.

In any event, the facts are viewed in a light

ting the rules and regulations of both the sheriff's department and the operation of the Johnson County Jail. [Richards Dep., p. 13]. During the relevant time period, Major Joe Barger held the position of jail commander and bore the responsibility of overseeing the jail's operation. [Richards Dep., p. 10; Barger Dep., pp. 5, 7]. In this capacity, Barger reported on a weekly basis to Richards regarding the operations of the jail. [Barger Dep., p. 29–30].

During Richards' tenure, the jail had three types of cell classifications: maximum security, medium security and minimum security. [Richards Dep., pp. 26–28]. Richards did not personally classify inmates. In fact, Richards never had any contact with either Carmichael or Carter, his assailant. [Richards Dep., p. 19; Carmichael Dep., p. 22]. Instead, Richards delegated the duty to classify inmates to the jail staff, leaving the individualized classification of an inmate to the discretion of the shift leader on duty at the time the inmate arrived at the jail. [Richards Dep., p. 29]. In other words, the book-in officer classified inmates, including Carter, with the supervisor's advice. [Richards Dep., p. 30].

At the time of Carter's initial custody assessment, May 31, 2000, Mark Grace recommended Carter's classification as maximum security, with the approval of his

supervisor, Sergeant David Emery. In addition, Carter's custody assessment identified Carter as a "known management problem." [Barger Dep. Ex. 4]. Carter was in custody on a charge of criminal recklessness with a deadly weapon, a Class D felony, for allegedly stabbing a fellow resident of the Atterbury Job Corps Center in the arm, chest and hand. [Pl.'s Ex. 1]. As a result of Carter's maximum security classification, he should have been placed in Cell Block D, which housed maximum security prisoners in primarily one-man cells. [Barger Dep., pp. 15, 21]. However, during the relevant time period, Carter and Carmichael shared a two-man cell in the C Block of the Johnson County Jail, and did so for approximately three days. [Carmichael Dep., pp. 10–11; Anthony Ferguson Dep., p. 17]. In contrast to Cell Block D, Cell Block C housed prisoners designated minimum/medium security. [Barger Dep., pp. 15–16, 22, 28]. Barger does not know why Carter was not in Cell Block D. [Barger Dep., p. 28].

Pursuant to court order, the Johnson County Sheriff's Department obtained custody of Carmichael through a transfer from the Westville Correctional Facility in order for Carmichael to attend a hearing in the Johnson County Juvenile Court. [Docket No. 56, Ex. 1].[2] Carmichael's initial custody assessment, performed on June 27, 2000, resulted in his classification as medium security.[3] The assessment

---

most favorable to Carmichael.

2. To establish these and other facts, Carmichael relies on the affidavit and expert report of William F. Naber. Such reliance is improper. While Naber can proffer his *opinion* based on the facts of this case, his report, by itself, does not establish the facts on which his opinion is based. Quite simply, Naber has no first hand knowledge of the events surrounding this lawsuit and, therefore, his rendition of the "facts" is hearsay. Although not specifically disputed by Richards, this does not alleviate Carmichael of his responsibility to rely on admissible evidence. *See* S.D. Ind. L.R. 56.1; *Rayl v. Decision One Mortg. Co.,*

2003 WL 21989992, *3 n. 3 (S.D.Ind.2003). However, in response to Richards' second motion for summary judgment, Carmichael has supplied those documents, i.e. the jail's records for Carmichael, that allow the Court to infer the facts suggested by Carmichael. Richards does not object to the admissibility of these documents.

3. The Court notes that, pursuant to the scale used to assess an inmate's security level, Carmichael had the requisite points to be designated "maximum security." However, the assessment form also allows classifying officers to override the scale and recommend an alternative security level. This occurred with

form also indicated that Carmichael had "no problems." [Barger Dep., Ex. 5]. According to Barger, Carmichael's medium security classification would place him in either the B, C or E block of the jail. [Barger Dep., p. 22]. While maximum security and medium security prisoners should not be placed together, this occurred for approximately a year and one-half during the construction of the new section of the jail and the remodeling of the old section. [Barger Dep., pp. 30–31]. Richards knew of this practice.[4] [Barger Dep., pp. 30–31].

On July 1, 2000, Carter stabbed Carmichael in the eye with a pencil. [Docket No. 25, ¶ 8; Docket No. 26 ¶ 8; Carmichael Dep., pp. 10–11]. Approximately twenty minutes after the incident, an ambulance from Franklin Hospital arrived and an EMT immediately taped a Styrofoam cup over Carmichael's eye to prevent anything from bumping or hitting the pencil. The ambulance took Carmichael to Methodist Hospital within thirty minutes of arriving at the jail. [Carmichael Dep., pp. 22–23]. Although Carmichael had blurry vision for approximately one year, ultimately he suffered no vision loss as a result of the stabbing. [Carmichael Dep., p. 27].

Carmichael was scheduled to attend a follow-up examination by an ophthalmologist on July 3, 2000. However, the jail did not take Carmichael to this appointment because he had been transferred back to Westville Correctional Facility before the

follow-up was to occur. [Pl.'s Ex. 2; Carmichael Dep., pp. 28, 40–41; Docket No. 56, Ex. 1]. Thereafter, on July 27, 2000, Westville again transferred custody of Carmichael to Johnson County so that Carmichael could attend a hearing on July 28, 2000. [Docket No. 56, Ex. 1]. At this time, Carmichael alleges that jail personnel failed to give him his medication and eye drops, or otherwise provide him with medical treatment. [Carmichael Dep., pp. 44–45; Pl.'s Ex. 3]. However, Carmichael was unaware what medications he had been prescribed by the hospital, if any. [Carmichael Dep., p. 47]. Additionally, Carmichael "witnessed the jail personnel taking medications away from inmates, even heart medications, and not passing out medications to inmates." [Docket No. 42, p. 9; Carmichael Dep., pp. 28, 30–32].

After the stabbing, Corrections Officer Anthony Ferguson removed Carter to a segregation cell in Cell Block D. [Ferguson Dep., pp. 6, 17–18]. Prior to the assault and while in the Johnson County Jail, Carter had been involved in other altercations with inmates. After a disciplinary hearing on May 19, 2000, the sheriff's department found Carter guilty of attempting to assault another individual and committing battery without a weapon. [Barger Dep., Ex. 2]. As punishment, Carter received "30 days in segregation, 15 days suspended pending no further rules violation. 30 days loss of credit time, 15 days suspended pending no further rules violation."[5] [Id.].

respect to Carmichael and he was classified as "medium security."

4. For this proposition, Carmichael relies on Barger's testimony that Richards should have known as a matter of "common sense" given the jail's overcrowded conditions. [Docket No. 42, p. 7; Barger Dep., pp. 30–31]. While perhaps a stretch, viewed in a light most favorable to Carmichael, the Court will assume Richards' knowledge.

5. Carmichael also suggests that Carter was involved in an additional altercation on June

10, 2000, relying on Naber's expert report and Barger's deposition. However, the cited portion of Barger's deposition does not stand for this proposition and, as explained above, Naber's insight on the matter is hearsay. Regardless, whether Carter had been involved in two or three fights is hardly outcome determinative. The fact remains that he had been involved in other fights with inmates while in the jail's custody and before Carmichael's stabbing.

Since January 15, 2001, the jail has documented approximately 48 fights involving inmates. [Pl.'s Ex. 5]. Additionally, Richards acknowledged several incidents where inmates had been beaten. [Richards Dep., p. 44]. However, Richards was not aware of any other incident at the jail involving the stabbing of an inmate by another inmate with a pencil. [*Id.*]. Prior to Carmichael's stabbing, inmates were provided with full-sized "No. 2" pencils as part of their hygiene pack. Since the stabbing, the jail replaced the full-sized pencils first with short "golf" pencils and then later replaced the "golf" pencils with flexible pens. [Ferguson Dep., pp. 29–33, 35].

## IV. Discussion.

Carmichael alleges that Richards is liable, both individually and in his official capacity, because Richards violated certain rights protected by the Eighth Amendment of the United States Constitution. "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In addition, "[t]he Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.*, quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). It is the last two duties—medical care and physical safety—upon which Carmichael focuses.

In order to prevail on his § 1983 claim based on the Eighth Amendment, Carmichael must prove two things: (1) the alleged deprivation must be objectively "sufficiently serious"; and (2) and Rich-

ards was deliberately indifferent to the alleged deprivation. *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. With respect to the first requirement, "[f]or a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* "In the medical care context, the objective element requires that the inmate's medical need be sufficiently serious." *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir.1997). As for the second requirement, "[u]nder the Eighth Amendment, deliberate indifference amounts to criminal recklessness—the defendant must have known that the plaintiff 'was at serious risk of being harmed, [and] decided not to do anything to prevent that harm from occurring even though he could easily have done so.'" *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir.1998) (citations omitted). In other words, a prison official may be found liable if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. As explained more fully below, Carmichael fails to meet these requirements for each of his claims.

### A. Individual Liability.

It is undisputed that Richards did not actively participate in the alleged constitutional violations. For example, Richards did not personally give inmates their security designation, nor did he make the decision to place Carter and Carmichael in the same cell. Those duties were delegated to Barger and the jail staff. Furthermore, Richards did not have any contact with either Carter or Carmichael during their stays at the jail. In his opposition to summary judgment, Carmichael acknowledges that "42 U.S.C. Section 1983 does

not allow actions against individuals merely for their supervisory role of others." [Docket No. 43, p. 3]. *See Boyce v. Moore,* 314 F.3d 884, 888 (7th Cir.2002) ("a supervisor cannot be held liable in a § 1983 action unless the individual was personally involved in the wrongful conduct such that he or she caused or participated in the alleged violation."). However, Carmichael also correctly notes that direct participation by Richards is not necessary if Carmichael can prove that Richards "acquiesced in some demonstrable way in the alleged violation." *Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir.2003). Carmichael contends that the sheriff's acquiescence comes in the form of an alleged policy that allowed medium security prisoners and maximum security prisoners to be placed in the same jail cell.[6] [Docket No. 43, pp. 3–5]. Specifically, Carmichael claims that "[i]t was this very act of mixing violent prisoners with non-violent prisoners that caused the injury to John Carmichael." [Docket No. 43, p. 4].

■ However, as Richards points out, a "policy of not screening and then segregating potentially violent prisoners from nonviolent prisoners is not itself a facial violation of the Eighth Amendment." *Burrell v. Hampshire County,* 307 F.3d 1, 10 (1st Cir.2002). [Docket No. 49, p. 8]. *See also Cotner v. Knight,* 61 F.3d 915, 1995 WL 441408, at *10 (10th Cir.1995) (unpublished) (finding policy of transferring medium security inmates to maximum security

facility was not unconstitutional). By this, the Court does not suggest that such a policy can never violate the Eighth Amendment. *See Burrell,* 307 F.3d at 10 ("Of course, . . . lack of a classification system may be part of an Eighth Amendment violation."); *Malone v. Becher,* 2003 WL 22080737, at *12 (S.D.Ind.2003) ("*[W]ithout more,* 'classification of inmates, whether or not desirable, is not a constitutional requirement.'") (emphasis added), *quoting Martin v. Tyson,* 845 F.2d 1451, 1456 (7th Cir.1988). " '[T]here must be an affirmative link between the policy and the particular constitutional violation alleged.'" *Palmer,* 327 F.3d at 594, *quoting City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). As explained more fully below, Carmichael fails to establish the required affirmative link.

■ Carmichael essentially argues that, since Richards retained ultimate responsibility for the jail's operation, including its rules and regulations, and because he knew that non-violent (medium security) and violent (maximum security) prisoners were celled together and that policy led to Carmichael's injury, Richards should be liable. Although not specifically mentioned in Carmichael's opposition brief, the Court presumes that Carmichael relies on the testimony of correctional expert William F. Naber as evidence of Richards' alleged deliberate indifference.[7] Naber opines that:

---

**6.** Carmichael appears to use "medium security" and "minimum security" interchangeably when referring to the alleged practice of mixing different security classifications of prisoners. [*See* Docket No. 43, p. 4]. For example, citing the deposition of Barger, Carmichael states that "[f]or over a year and a half, minimum security prisoners and maximum security prisoners were placed in cells together." [*Id., citing* Barger Dep., p. 30]. However, Barger testified that *medium* security prisoners were placed in cells with maximum secu-

rity prisoners. In addition, it is undisputed that Carmichael was classified as medium security, not minimum. Due to Carmichael's medium security classification, the Court will refer only to that security designation in its discussion.

**7.** As noted *infra,* Carmichael's summary judgment argument hardly mentions Naber's report. Nevertheless, the Court has examined Naber's report as part of the summary judgment inquiry.

! the assault on Carmichael by Carter was foreseeable and could have been prevented by employing reasonable standards of care and protection by Richards. [Docket No. 42, p. 7; Naber Aff., Expert Report, p. 4];

! the attack by Carter was foreseeable because of his stabbing incident while at Atterbury and his three previous assaults while in the Johnson County Jail. [Docket No. 42, p. 7; Naber Aff., Expert Report, p. 4];

! Carter should have been placed in close custody and he should have been housed separately from other inmates for everyone's safety. [Docket No. 42, p. 7; Naber Aff., Expert Report, p. 4];

! supplying Carter with a full-sized lead pencil, which could be used as a stabbing weapon, was a predictable danger. [Docket No. 42, p. 8; Naber Aff., Expert Report, p. 6];

! Carmichael, as a medium security prisoner, should never have been housed with Carter, a maximum security, close-custody inmate who displayed obvious mental and emotional instability. [Docket No. 42, p. 8; Naber Aff., Expert Report, p. 8]; and

! the inmate classification system used at the Johnson County Jail is inadequate and did not meet the current standards in the corrections industry. [Docket No. 42, p. 10; Naber Aff., Expert Report, p. 8].

In reply, Richards argues that Naber "does not allege nor come forward with any facts which demonstrate that J.D. Richards was subjectively aware of a significant risk that Marcus Carter would attack John Carmichael nor that he acted with deliberate indifference in consciously disregarding that risk." [Docket No. 49,

p. 5]. The Court agrees. While Naber's testimony may create an issue of fact with respect to the first requirement of the *Farmer* test, i.e. whether the alleged deprivation was "sufficiently serious," it is not enough to satisfy the second requirement, "which emphasizes the subjective nature of a deliberate indifference inquiry." *See Washington v. LaPorte County Sheriff's Dept.,* 306 F.3d 515, 518 (7th Cir. 2002).

Although *Washington* involved the attack on a pretrial detainee by another inmate, the Seventh Circuit analyzed that case under Eighth Amendment precedent.[8] In that case, similar to the case at hand, the plaintiff's only proffer of evidence regarding deliberate indifference was that of an expert who "concluded that allowing inmates to choose their own bunks created 'a high probability of inmate-on-inmate assault.' " *Id.* Holding that this evidence falls short of *Farmer's* test, the court explained:

> Though a risk may be obvious to a reasonable person, *Farmer* explicitly adopted a subjective test, describing an objective standard as "not an appropriate test for determining the liability of prison officials under the Eighth Amendment." *Farmer,* 511 U.S. at 841[, 114 S.Ct. 1970]. The key is that the individuals must have actual knowledge of the risk. *See Case v. Ahitow,* 301 F.3d 605, 607 (7th Cir.2002) ("[T]he test is whether the guards know that the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so."). Here, Washington did not present any facts from which a jury could find that the prison guards were aware of a substantial risk that *Washington* might be harmed. Instead he relies on [the ex-

---

**8.** Although cases involving pretrial detainees fall under the Due Process Clause of the Fourteenth Amendment, the analysis for Eighth Amendment violations is analogous. *Washington,* 306 F.3d at 517.

pert's] conclusion that allowing the inmates to control bunk assignments was an obvious risk that the prison officials should have recognized. There was no evidence that Washington expected to be attacked by Hood, or that he or prison officials should have expected an attack. He shared his cell with Hood for two weeks without incident, did not inform the guards that Hood had thrown him out of their shared cell, that he had briefly fought with Hood, or that he in any way feared harm from Hood or another inmate.

*Washington,* 306 F.3d at 518.

Likewise, in the instant matter, Carmichael has not provided any evidence suggesting Richards knew of a substantial risk that Carmichael might be harmed. Prior to the stabbing, Carmichael and Carter had shared a cell for three days without incident or suggestion that Carmichael faced a significant risk of harm. Indeed, there is no evidence that Richards knew any of the following: that Carter had previous altercations at the jail, that Carter was jailed for allegedly stabbing another individual, or that Carter had been classified maximum security and Carmichael medium security and placed in the same cell.[9] Simply put, there is no evidence that Richards even knew that he held Carmichael and Carter or anything about them. *See K.F.P. v. Dane County,* 110 F.3d 516, 519 (7th Cir.1997) (sheriff had no day-to-day involvement in prisoner classification and record did not support sheriff held

"subjective state of mind required to show deliberate indifference," therefore summary judgment was proper on individual liability claim). Carmichael's evidence falls far short of meeting the subjective requirement of deliberate indifference to attach individual liability to Richards.

Of course, as *Farmer* and its progeny illustrate, "[u]nder some circumstances, a risk might be so obvious that actual knowledge on the part of prison officials may be inferred." *Id.* at 519, *citing Farmer,* 511 U.S. at 842, 114 S.Ct. 1970. However, Carmichael's evidence fails in this respect as well. The Supreme Court cited examples of an "obvious" risk of inmate violence as when a "plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past and the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it . . . .' " *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970. Carmichael has made no such showing.

Although Carmichael submitted evidence that, since January 15, 2001, at least forty-eight fights have occurred at the jail and that Richards knew of several incidents where inmates had been beaten, that evidence is not sufficient to establish "longstanding" or "pervasive" inmate violence in the past. First, evidence of fights since January 2001 does not establish evidence of fights occurring prior to the attack on Carmichael in July 2000.[10] More-

---

9. In his statement of facts, Carmichael submits that "[a] correctional guard told John Carmichael after the stabbing incident that he knew Marcus Carter was going to give them trouble, more trouble" and "[t]he lady who classified John Carmichael, Joanne Hall, told Mr. Carmichael after the stabbing incident, that she knew something like that could happen with Marcus Carter because of his mental problems and need for medication." [Docket No. 42, pp. 7–8]. Neither of these facts suggests that Richards knew of Carter's behavior

or knew that there was a substantial risk that Carmichael would be harmed. Nor can these facts be imputed to Richards.

10. In his opposition brief, Carmichael suggests that Richards failed to properly respond to his discovery requests by failing to provide reports on inmate violence "for the past five (5) years." [Docket No. 43]. However, Carmichael did not file a motion to compel regarding this alleged failure and the Court does not view a summary judgment brief as

over, even considering the forty-eight fights since January 15, 2001, there is no evidence that any of these fights occurred as a result of mixing medium security prisoners with maximum security (or even that those fights involved medium and maximum security prisoners). "Simply describing the jail officials as deliberately indifferent because they made a decision to implement a program which, in general terms could increase the probability of violence, ignores the subjective element of *Farmer's* test." *Washington*, 306 F.3d at 519. In short, the evidence does not establish that Richards was deliberately indifferent to Carmichael's physical safety.

More important, Carmichael offers no evidence—other than his expert's opinions that the attack was foreseeable—to show that the policy of mixing maximum and medium security inmates resulted in increased inmate violence. In other words, there is no evidence of a causal link between the policy and the attack. *See James v. Milwaukee County*, 956 F.2d 696, 701 (7th Cir.1992) (holding that a classification system allowing probation and parole violators to be housed in same open dormitory "without regard to criminal history" was not a violation of Eighth Amendment where plaintiff "failed to show a causal relationship between the challenged policy and the particular constitutional deprivation alleged"). *See also K.F.P. v. Dane County*, 110 F.3d 516, 519–20 (7th Cir.1997) (no Eighth Amendment violation where no evidence of a causal link between a policy of housing non-violent and violent inmates together and harm to inmates).

Carmichael's reliance on his expert's opinion falls short for a number of reasons. First, Carmichael's argument is virtually devoid of any mention of Naber's report.

While Carmichael did point to Naber's conclusions that the "classification plan or system did not meet current standards in the correctional industry" [Docket No. 43, p. 9] and that "the attack was foreseeable and preventable" [*Id.* at p. 10], neither Naber's report nor other evidence cited in the record suggests a causal link between the *policy* and the harm. For example, Naber's report does not provide insight or opinion on whether inmate violence was pervasive at the Johnson County jail and what impact, if any, the policy of mixing medium and maximum security prisoners had on inmate violence. Instead, Naber focuses almost exclusively on the incident between Carter and Carmichael and whether the stabbing was foreseeable based on Carter's previous altercations at the jail and his underlying offense. The Seventh Circuit has made clear that "[w]hen a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir.2003); *see also Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427 ("where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish ... the requisite fault on the part of the municipality ....."). Naber's report does not establish this requirement.

The requirement that Carmichael produce evidence of a causal link between the policy (mixing medium and maximum security inmates) and the harm (increased risk of violence) to avoid summary judgment is not onerous. During discovery Carmicha-

the appropriate forum to raise this issue. The Court's review on summary judgment is limited to the admissible evidence properly before it. Accordingly, there is no evidence before

the Court regarding inmate violence during the time preceding Carter's attack on Carmichael.

el could have sought (by way of a motion to compel if necessary) comparative evidence between the number of inmate fights that occurred before and after the alleged policy took effect, i.e. before jail renovations began. Similarly, Carmichael could have obtained information regarding the security classifications of those inmates that had been involved in altercations. *See Palmer v. Marion County,* 327 F.3d 588, 596–97 (7th Cir.2003) (describing various avenues to demonstrate widespread practice of an unconstitutional nature, including "raw data from defendants' records regarding cell block assignments as well as the frequency of inmate-on-inmate assaults"). However, like the plaintiff *Washington,* Carmichael has proffered no evidence to suggest that the alleged policy increased the risk of violence. *Washington,* 306 F.3d at 519 (the plaintiff "has provided no evidence suggesting that violence was a pervasive element of the jail's environment or that there was any increased risk of violence at the jail compared to other jails with different housing policies."). "Neither the facts of the case nor [the] expert offers support for the conclusion that this incident was anything more than an unfortunate random act of violence in a prison, which does not impose liability on prison officials." *Id.*

■ Carmichael fares no better with respect to his claim that Richards is individually liable under the Eighth Amendment by refusing to provide Carmichael with medical treatment. The evidence shows that jail staff called an ambulance after the stabbing. Thereafter, EMTs treated Carmichael and took him to Methodist Hospital within thirty minutes of arriving at the scene. This does not suggest deliberate indifference, and Carmichael does not allege that his constitutional deprivation occurred as a result of the medical care he received immediately after the attack.

Instead, Carmichael complains that he was not taken to a follow-up appointment and was not given medication and eye drops. Even assuming these facts as true, there is nothing in the record that indicates that Richards had any knowledge of these needs or requests. Assuming Carmichael's medical needs, i.e. the follow-up appointment and medication, were objectively sufficiently serious, Carmichael once again fails the subjective requirement of the *Farmer* test. Likewise, Carmichael's testimony that he "witnessed the jail personnel taking medications away from inmates, even heart medications, and not passing out medications to inmates" [Docket No. 42, p. 9; Carmichael Dep., pp. 28, 30–32] also fails to meet the "obviousness" standard for inferring knowledge to Richards as articulated in *Farmer.* Carmichael's testimony, without more, does not establish a longstanding or pervasive practice of refusing medical treatment to inmates.

Finally, Carmichael argues that "[t]he Plaintiff believes the Sheriff was simply shuffling prisoners out of the Jail to avoid the costs of their treatment." [Docket No. 43, pp. 5–6]. This argument is nothing more than unsubstantiated speculation. Accordingly, Richards' motion for summary judgment with respect to Carmichael's claims against him in his individual capacity is GRANTED.

## B. Official Capacity Liability.[11]

11. Carmichael's official capacity claim against Richards appears to be directed only to Carmichael's Eighth Amendment "physical safety" claim as Carmichael failed to brief the issue with respect to his Eighth Amendment "medical needs" claim. [Docket No. 43, pp.

6–8]. Therefore, the Court deems any such "medical needs" argument waived. *See Kramer v. Banc of America Securities, LLC,* 355 F.3d 961, 964 n. 1 (2004), citing *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.1991) ("We have repeatedly made clear

■ Because Carmichael sued Richards in his official capacity, the Court treats this claim as against the office of sheriff and, therefore, Johnson County. *See Luck v. Rovenstine,* 168 F.3d 323, 325 (7th Cir. 1999). To establish liability under 42 U.S.C. § 1983 against a municipality, i.e. the county, Carmichael must go beyond proof that the county employed a tortfeasor as it is well settled that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell,* the Supreme Court stated:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

436 U.S. at 694, 98 S.Ct. 2018. "Thus, to establish a genuine question of fact as to whether [the county was] deliberately indifferent to [Carmichael's] safety, [Carmichael] is required to establish that [the county has] a custom or policy that contributed to the infliction of the assault and his resulting injury." *Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir.2003).

With respect to unconstitutional policies or customs, the Seventh Circuit has repeatedly stated that these can take three forms:

(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Rasche v. Village of Beecher,* 336 F.3d 588, 597 (7th Cir.2003). Carmichael claims that the county's alleged unconstitutional policy falls under the second category because "Sheriff Richards knew and consented to the policy of placing maximum security inmates in locked down jail cells with minimum security prisoners." [Docket No. 43, pp. 6–7]. However, as noted above, a "policy of not screening and then segregating potentially violent prisoners from non-violent prisoners is not itself a facial violation of the Eighth Amendment." *Burrell v. Hampshire County,* 307 F.3d 1, 10 (1st Cir.2002). Moreover, "classification of inmates, whether or not desirable, is not a constitutional requirement." *Martin v. Tyson,* 845 F.2d 1451, 1456 (7th Cir.1988). Therefore, assuming the county had such a policy, without more—that is, evidence that the policy caused or precipitated inmate violence—Carmichael's official capacity claim must fail. "At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

To meet this causation requirement, Carmichael points to evidence of forty-

---

that perfunctory and undeveloped arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).")

In addition, as Richards points out in reply, he "incorrectly assumed that Plaintiff was arguing that J.D. Richards, in his official ca-

pacity, was liable for an alleged policy of allowing inmates to have pencils ...." [Docket No. 49, pp. 7–8]. While this may have been a potential argument, Carmichael's brief opposing summary judgment fails to make any such contention. Therefore, this argument is waived as well.

eight "other fights," arguing that "[o]bviously, some of these fights would have occurred without regard to any policy or custom of the Sheriff. However, the Court must assume that some of these acts of violence would not have occurred if the most violent prisoners (maximum security) had been confined separately from the general population of the jail." [Docket No. 43, pp. 7–8]. As discussed above, however, the forty-eight other fights to which Carmichael refers occurred after the incident that is the focus of this lawsuit. Thus, these altercations cannot serve as a basis to establish deliberate indifference as of the time Carter assaulted Carmichael. More important, Carmichael provides no evidence, "such as statistical or comparative evidence," that suggests the policy of mixing prisoner classifications *caused* inmate violence. *See James v. Milwaukee County,* 956 F.2d 696, 701 (7th Cir.1992). Instead, Carmichael weakly argues that the Court "must assume" that some of the fights would not have occurred absent the policy. [Docket No. 43, p. 8]. The Court disagrees. At summary judgment, the Court is "not required to draw every conceivable inference, but only those that are reasonable." *Vartanian v. Metropolitan Life Ins. Co.,* 2002 WL 484852, *4 (N.D.Ill. 2002), citing DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987). Without statistical or comparative evidence, there is no evidence in the record to draw this inference other than Carmichael's attorney's bold and unsupported statement. As explained above, even Carmichael's expert does not go so far. Instead, Naber limits his opinions to the foreseeability of Carter's attack on Carmichael because of Carter's past actions and not, as is relevant here, the policy of bunking medium and maximum security prisoners together. In short, because Carmichael has not established a causal connection between the county's alleged policy and harm to inmates, his official capacity claim fails. *See Robles v. City of Fort Wayne,* 113 F.3d 732, 735 (7th Cir.1997) (noting that a plaintiff must establish a direct causal link between a custom or policy and the unconstitutional conduct). Richards' motion for summary judgment on this claim is, therefore, GRANTED.

### C. Qualified Immunity.

"When presented with a defense of qualified immunity, courts must: (1) determine whether the plaintiff has alleged the deprivation of an actual constitutional right and (2) if so, determine whether that right was clearly established at the time of the alleged violation." *Sparing v. Village of Olympia Fields,* 266 F.3d 684, 688 (7th Cir.2001), citing Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Because the Court finds that Richards prevails on the merits, his motion for summary judgment based on qualified immunity is moot. Therefore, the Court need not reach the issue of qualified immunity. *Riccardo v. Rausch,* 359 F.3d 510 (7th Cir.2004).

### D. State Claim.

Richards does not argue the merits of Carmichael's state claim. Instead, Richards contends, weakly and without authority, that "Plaintiff's Amended Complaint does allude to state law claims such as negligence. Those claims, however have not been specifically pled and are therefore subject to dismissal or summary judgment by this Court." [Docket No. 36, p. 13]. The Court disagrees. Carmichael need not "specifically plead" his negligence claims as the Federal Rules of Civil Procedure call for nothing more than notice pleading. *See Shah v. Inter–Continental Hotel Chicago Operating Corp.,* 314 F.3d 278, 282 (7th Cir.2002) ("The plaintiff is not required to plead facts or legal theo-

ries or cases or statutes, but merely to describe his claim briefly and simply.") Under Indiana law, to state a claim for negligence Carmichael must establish three elements: "(1) A duty owed by the defendant to conform its conduct to a standard of care arising from its relationship with the plaintiff; (2) a breach of that duty; and (3) an injury proximately caused by the breach of that duty." *Rawls v. Marsh Supermarket, Inc.*, 802 N.E.2d 457, 459 (Ind.Ct.App.2004). As Carmichael points out, in his Amended Complaint he alleged that: Richards owed a duty to the Plaintiff to provide a "reasonably safe environment during the period of his confinement," Richards "breached this duty" by placing Carter, "knowing his dangerous and violent propensities," in Carmichael's cell and by allowing Carter to have "possession of a dangerous weapon," and that Richards was "negligent" by failing to segregate Carter. [Docket No. 43, pp. 9–10; Am. Compl. ¶ 19]. Thus, the Court believes Carmichael satisfied the requirements of notice pleading with respect to his negligence claim.

The Court must, therefore, consider the appropriateness of retaining jurisdiction over Carmichael's remaining state claim. *See* 28 U.S.C. 1367. "The general rule is that when as here the federal claim drops out before trial ... the federal district court should relinquish jurisdiction over the supplemental claim." *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir.1997). "If, however, an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case." *Id.* at 1354. Because neither party argued the merits of Carmichael's negligence claim, the Court declines to make this determination. The Court sees no reason to disregard the general rule of relinquishing jurisdiction. Accordingly, the Court declines to exercise supplemental jurisdiction over Carmichael's remaining state negligence claim and it is, therefore, dismissed without prejudice.

## V. Conclusion.

For the reasons stated above, Richards' first motion for summary judgment [Docket No. 35] is GRANTED with respect to Carmichael's federal claims. Richards' second motion for summary judgment [Docket No. 51] is DENIED as MOOT. Finally, Carmichael's remaining state negligence claim is DISMISSED without prejudice.